UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
BRIAN LEO,
                                      :
              Plaintiff,              MEMORANDUM & ORDER
                                      :
      -against-                       13cv7191 (MHD)
                                      :
LONG ISLAND RAILROAD COMPANY,
                                      :
              Defendant.
-------------------------------x

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:


     Plaintiff Brian Leo commenced this lawsuit under the Federal
Employers Liability Act ("FELA"), 45 U.S.C. § 51 et seq., seeking
recovery for physical and other injuries suffered while employed by
the defendant Long Island Railroad Company ("LIRR"). Following
trial, a jury returned verdicts finding defendant liable and
awarding plaintiff a total of $3,189,122.64 in past and future
damages.


     Following entry of judgment for that amount, defendant has
moved for a new trial or a remittitur of portions of the damages
award. Plaintiff has opposed. For the reasons that follow,
defendant's motion is granted in part.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

I. <u>The Pertinent Trial Evidence</u>

    A. <u>The Accident</u>

Mr. Leo was employed by the LIRR as an assistant signalman. On November 2, 2011 he was working to install innerduct[1] under a platform at the Kew Gardens station in Queens. While crawling on hands and knees under the platform, he encountered a substantial pile of large broken pieces of concrete, apparently rubble from a pre-existing platform that had never been removed. As he crawled over the broken concrete, a heavy piece of it dislodged and fell onto his right wrist and arm, trapping him in that position. He attempted to pull his hand from under the concrete but was unable to do so. Shortly after, a fellow worker pulled the concrete slab away, freeing his arm. (Tr. 137-38, 142-55, 251, 373).

---

[1] According to plaintiff, innerduct is "a hollow plastic tubing. It basically protects the cables and the fiber-optic that goes through it." (Tr. 142).

B. Medical Evidence

Mr. Leo remained at the worksite until the end of his shift. That evening, however, encountering stiffness and swelling, he visited the emergency room at Good Samaritan Hospital, where an X-ray of his wrist showed no fracture. (Id. at 155-56; Pl.'s Ex. ["PX"] 23 at pp. 1-6 [Record of Nov. 2, 2011 visit to Good Samaritan Hospital]).

The next day plaintiff went to the LIRR medical facility and was taken off work. (Tr. 157; see also PX 26 pp. 27 [LIRR Medical Center receipt dated Nov. 3, 2011], 74-75 [Medical notations for Nov. 3, 2011 visit to LIRR Medical Center]). Two days later he consulted Dr. Arthur Pallotta, an orthopedic surgeon to whom he had been referred by the hospital. The doctor observed swelling, tenderness and abrasions on the wrist as well as sensitivity on the median nerve.[2] He diagnosed a "sprain/crush" injury and put a splint on the arm. (Tr. 50-54, 157; PX 13 p. 5 [Medical chart dated Nov. 4, 2011]).

---

[2] According to Dr. Pallotta, "[t]he median nerve is one of the nerves that innervates the muscles and the sensation in the hand." (Tr. 53; see also Tr. 58).

3

On November 28, 2011 -- nearly four weeks after the accident -- Dr. Pallotta found some swelling and tenderness over the back of the wrist. (Tr. 54-55). On December 16, 2011, he again saw plaintiff and noted continuing median-nerve sensitivity and also observed that the ring and small fingers of the hand hung further down than the normal cascade of the fingers on the hand, a phenomenon known as clawing. (Id. at 55-57, 64). Noting some weakness in the first dorsal interossei and loss of sensation in the affected fingers, Dr. Pallotta suspected possible ulnar-nerve injury[3] and ordered an electromyelogram ("EMG") and nerve conduction study.[4] The results of these tests were normal. (Id. at 57-64; see also PX 13 pp. 6 [Medical chart dated Nov. 28, 2011], 12 [Letter to LIRR Medical Department from Dr. Pallotta signed Nov. 28, 2011]).

---

[3] Dr. Pallotta explained that the ulnar nerve "supplies the majority of the muscles that are actually in the hand," of which the first dorsal interossei is one. (Tr. 59).

[4] These make up a "combined test" that Dr. Pallotta described as follows:

> Muscles generally emit a particular signal. So if you put an electrode into a muscle, you will detect a signal. If a muscle is without that information that comes from the nerve to the muscle, the muscle begins to exhibit a particular type of electrical behavior or activity. And that's the kind of thing that can be picked up on an EMG.

(Tr. 62-63). Dr. Pallotta stated that, when assessing patients that present with these types of injuries, the results of this test are "just one piece in the puzzle." (Id. at 63-64).

4

Dr. Pallotta saw plaintiff again on March 7, 2012. (Tr. 64). Mr. Leo reported little improvement, and the doctor again found decreased sensation in the fingers and continued clawing. He also observed increased sensitivity in the ulnar nerve and diagnosed a right wrist sprain/crush injury with median- and ulnar-nerve dysfunction, as well as neuritis.[5] (Id. at 64-66; see also PXs 13 p. 8 [Medical chart dated Mar. 7, 2012] & 15 pp. 7-8 [Results of test dated Feb. 1, 2012]). On plaintiff's next visit, on April 4, 2012, the doctor observed increased drooping of the two affected fingers. (Tr. 66). He found that sensation in the two affected fingers had decreased "a little bit", that the first dorsal interossei muscle was "slightly weak", and that another muscle innervated by the ulnar nerve -- the flexor digitorum profundus -- "appeared to be weak, as well." (Id. at 66-67; see also PX 13 p. 9 [Medical chart dated Apr. 4, 2012]).

In connection with the April 4 visit, Dr. Pallotta ordered another nerve-conduction study. That study was inconclusive as to whether the symptoms were attributable to an ulnar-nerve injury, as the doctor had originally surmised. It did show, however, a right

---

[5] According to Dr. Pallotta, "[n]euritis is just inflammation of the nerve." (Tr. 66).

c8-t1 radiculopathy[6] and spontaneous activity at the right opponens pollicis muscle. (Tr. 67-68; PXs 13 p. 9 & 15 pp. 4-6 [Results of test dated May 11, 2012]). As Dr. Pallotta explained these findings, they could indicate that the source of the injury was located at a point in the nerve system above the forearm and elbow, and that a lack of innervation, whether of the median nerve or the ulnar nerve, might trigger these findings. (Tr. 68-72). Further, the doctor noted that such injury to the nerve could have been caused by an excess of pressure on the nerve, for example if the arm is pulled too high over the head. (Id. at 72-73).

On a May 23, 2012 visit, Dr. Pallotta found increased atrophy and weakness of the first dorsal interossei. He also noted decreased sensation in the fingers. (Id. at 73-74; PX 13 p. 1 [Medical chart dated May 23, 2012]). These findings were at least consistent with injury to the ulnar nerve or the brachial plexus, which feeds into the ulnar nerve. (Tr. 74; see also id. at 72).

Because of his concern that the injury might originate in the

---

[6] As described by Dr. Pallotta, radiculopathy is "meant generally as dysfuction of a nerve with origin from where it is exiting the spinal column" (Tr. 71; see also id. at 68), and "c8 and t1 are the major contributors to the ulnar nerve." (Id. at 69).

brachial plexus, Dr. Pallotta referred plaintiff to a Dr. Patrick Reid, a neurosurgeon. (Id. at 74-76). Dr. Reid opined that the injury was traceable to the posterior interosseus nerve, which is responsible for the extension of the fingers. (Id. at 75-76; PXs 16-17 [Medical records from Drs. Patrick Reid & Joseph Feinberg]).

Dr. Pallotta disagreed with that assessment based on a subsequent examination, on October 23, 2012, when he tested the strength of muscles innervated by the posterior interosseus nerve. (Tr. 76-78).[7] On that visit he also observed increased clawing of the two affected fingers. (Id. at 77). He then referred plaintiff to a brachial plexus specialist, a Dr. Christopher Winfree. (Id. at 78-79). Dr. Winfree diagnosed dysfunction of the ulnar nerve, probably at the wrist. (Id. at 79-80; PX 20 pp. 1-3 [Letter dated Dec. 10, 2012 from Dr. Winfree to Dr. Pallotta]).

---

[7] We note that -- unlike for most of plaintiff's appointments with Dr. Pallotta -- plaintiff did not provide us with copies of Dr. Pallotta's notes for, inter alia, the October 23, 2012 or January 2, 2013 appointments, although, likely accidentally, we were given two copies of the notes of both the May 23, 2012 visit and the March 8, 2013 visit. (See PX 13 pp. 1, 3, 10, 13). In any event, we see no reason why this undermines Dr. Pallotta's testimony at trial; and we also point out that Dr. Pallotta's file includes a note, written on November 30, 2012, in which he advises the recipient (presumably the LIRR) of plaintiff's inability to work at "fully duty" and explains that plaintiff is under his care for "r[ight] wrist sprain/crush injury w/median sensory neuropathy." (Id. at p. 4).

7

Dr. Pallotta next saw plaintiff on January 2, 2013. He observed a further worsening in the clawing. As for sensation, it had marginally improved. (Tr. 81). As Dr. Pallotta explained, plaintiff's effort to pull his arm out from under the concrete slab may well have injured his brachial plexus, leading to the symptoms that he observed. (Id. at 82-83).

Dr. Pallotta saw Mr. Leo again on March 8, 2013 and in July 2013, with similar results. (Id. at 83-85; PX 13 p. 2 [Medical chart dated Mar. 8, 2013]). Plaintiff was also referred to several specialists by Dr. Winfree and Dr. Pallotta. (Tr. 85-90; PX 13 p. 2 & PXs 18-20 [Medical records from Drs. Neal Cayne, Sheel Sharma & Winfree]). Among those doctors, one diagnosed a partial ulnar nerve neuropathy. (Tr. 87; PX 19 [Medical notations by Dr. Sheel Sharma dated June 13, 2013 & July 2, 2013]). In addition, plaintiff was subjected to follow-up EMG and nerve-conduction studies as well as several MRIs. The net result was that an MRI showed a swelling of the nerve roots on the right side where the brachial plexus exits the spinal chord. (Tr. 84, 86, 89; PX 20 pp. 9-10 [Radiology report dated Apr. 12, 2013]).

Dr. Pallotta offered the view that plaintiff was suffering from a dysfunction of the ulnar-nerve distribution and that this

8

dysfunction caused the clawing that he observed, although there was no certainty as to where along the distribution the damage had initially been inflicted. He also offered the opinion that there were no satisfactory treatment options and that the condition would not improve over time.[8] Finally, he opined that the injury was indeed likely caused by plaintiff's accident involving the trapping of his arm by a concrete slab and his effort to pull the arm from under that slab, and that the injury is permanent, although it does not cause neurological pain. (Tr. 82-83, 87-89, 90-96, 97, 133).

The defendant eventually concluded that plaintiff was unable to perform the functions of his prior job, which involved, among other requirements, the ability to scale a 90-foot pole while carrying up to 70 pounds of weight. (Id. at 158-60; PX 9). Thus, in

---

[8] Dr. Pallotta specifically addressed a set of procedures called "tendon transfers," which apparently involve "tak[ing] a muscle into a tendon off of one location and rerout[ing] it to another location to try to restore some functioning that's missing as a result of the deficit." (Tr. 95). However, Dr. Pallotta also stated that even a successful tendon transfer would not fully restore plaintiff's grip strength, although it might "improve extension." (Id.). Still, he did not think that this procedure would improve the appearance of clawing on plaintiff's hand at all (id.), and he "would not be optimistic about restoring function in such a way that would allow him to do, say, climb[] ladders, which would put him a position where his safety and the safety of others would be in question." (Id. at 94; see also id. at 186 ("That's when the tendon transfer came up, and it wasn't going to do anything.")).

9

September 2013, the LIRR found him medically disqualified from work as an assistant signalman. (Tr. 163-65; PX 27 p. 1 [Sept. 12, 2013 letter from Christopher Yodice to plaintiff]).

Plaintiff testified that he continues to suffer from weakness in the two fingers. (Tr. 167-70, 172-73). He disclaimed having suffered from any meaningful pain beyond a few days following the accident, although the medical records reflect continuing occasional discomfort and pain in the hand even years after the accident. (Id. at 161-62, 170; PX 26 pp. 160 [August 26, 2013 notation by Jessica Tombline, PA], 165 [June 12, 2013 notation by Pamela D. Nelson, RN], 168 [March 13, 2013 notation by Jessica Tombline, PA]).

As for the impact of the condition on plaintiff's ability to engage in recreational and other non-work activities that he had been accustomed to participate in before the accident, he mentioned an inability to hold a baseball, throw a football, and offer a firm handshake. (Tr. 169-70). He also mentioned his discomfort at being significantly dependent on the financial largesse of his parents, who had loaned him $40,000.00 to date. (Id. at 171-72 ("Q. How does that make you feel? A. Like a child again.")).

10

Defendant presented testimony from a hand surgeon, Dr. Alamgir Isani, who had examined plaintiff after reviewing treatment records. Dr. Isani testified that he had concluded that plaintiff's condition was not caused by damage to the ulnar nerve, as Dr. Pallotta had suggested, because prior testing did not demonstrate such damage and on his examination he found no atrophy of the intrinsic ulnar muscles. (Id. at 319-21, 326-34). He further stated that he could not make a diagnosis and at least questioned whether there was a neurological basis for the noted clawing even though his grip-strength testing of plaintiff showed a substantial difference between the two hands. (Id. at 316-17, 331-34, 336, 340).

C. Mitigation Efforts

Apart from the medical evidence, the trial record reflects testimony by plaintiff about his efforts to get replacement employment. Initially he sought help from the railroad. In followup contacts, plaintiff dealt with a Human Resources representative, Mr. James Giallorenzo, who, according to plaintiff, simply mentioned some general job categories and indicated that he would "keep his eyes open." According to plaintiff, Mr. Giallorenzo never referred him to any openings despite plaintiff's assurance to the

11

HR representative "that if they had a job for me, I'd be there the next day." (Id. at 165-66, 170; see also id. at 184-85). Mr. Giallorenzo testified that he had referred plaintiff to the LIRR website for job postings (id. at 291, 295-96), but he conceded that he did not know how many positions came available on the website for which plaintiff might have been eligible (id. at 298), that he had never advised plaintiff that any were available (id. at 298-99), that the railroad did not give injured employees such as plaintiff any priority for open slots on the website, and that hence plaintiff would be competing with as many as 2,000 other applicants for any slot for which he might arguably be qualified. (Id. at 298-300). The jury could therefore infer that the likelihood of plaintiff obtaining employment with the LIRR under these circumstances was minimal.

Plaintiff further testified that he had applied to many other companies for alternative work, principally in sales, since he was very limited in the ability to lift heavy objects. (Id. at 168). He has received uniform rejections, typically because he would be required to have considerable dexterity in handling computer keyboards, and he cannot do so because of the condition of his fingers. (Id. at 168-69, 185).

12

## II. <u>Plaintiff's Lost Wages Calculation</u>

On summation, plaintiff's counsel offered the jury his calculation of the total wages that plaintiff will lose in the future based on his present inability to continue in his LIRR job. (<u>Id.</u> at 404-06). Based on an assumption that plaintiff would work to age 60, which would take him to the year 2040 -- which Mr. Leo testified was his original intention (<u>see</u> <u>id.</u> at 141) -- and using the wage levels embodied in the current collective bargaining agreement (<u>see</u> <u>id.</u> at 138-41; PX 12), plaintiff calculated that his gross pay, exclusive of fringe benefits, for the period from the trial to 2040 would have been $2,014,212.54. (Tr. 406; Ballaine Decl. Ex. I).[9]

## III. <u>The Jury Verdict</u>

At the conclusion of the trial, the jury was given a special verdict form (Tr. 439-42), and was instructed <u>inter</u> <u>alia</u> on plaintiff's obligation to attempt to mitigate his damages. (<u>Id.</u> at 432-33). The jury returned with the following findings. With

---

[9] The parties did not dispute the accuracy of that calculation or of plaintiff's computation of past lost wages as totaling $189,122.64. (Tr. 405; <u>see</u> <u>also</u> Deft's Mem. 8).

13

respect to liability, it determined that defendant had been negligent "in arranging or supervising the project on which plaintiff was injured", that plaintiff had been injured as a result of that negligence, and that plaintiff had not been comparatively negligent. (<u>Id.</u> at 446-47). As for damages, it found that plaintiff had suffered lost earnings to date of $189,122.64 and that he would suffer future lost earnings of $2,000,000.00. (<u>Id.</u> at 447). In assessing past non-monetary losses, the jury valued plaintiff's damages based on physical pain and suffering and emotional distress to date at $100,000.00, and his future expected losses of this kind at $900,000.00. (<u>Id.</u> at 447-48).[10]

III. <u>Defendant's Current Motion</u>

Defendant has moved for a new trial on two separate grounds. First, it asks for a retrial on the basis that the jury's awards for future emotional injury and future lost income were excessive. It urges either a new trial or a remittitur of these awards to not more than $200,000.00 for future emotional distress and not more than $700,000.00 for future lost income. (Deft's Mem. 11-18; Deft's

---

[10] In charging the jury as to future non-economic injuries, we stated that plaintiff had not testified to physical pain beyond "the immediate aftermath of the incident in question" (Tr. 433), an instruction to which plaintiff did not object.

Reply Mem. 4-9). Second, defendant argues for a new trial on the premise that the court abused its discretion in refusing to allow admission of an edited surveillance tape, purportedly of plaintiff, which defendant offered without any effort at authentication. (Deft's Mem. 19-22; Deft's Reply Mem. 9-10).

Plaintiff opposes the motion. He contends that the challenged jury award for future lost income was reasonable, based on the evidence -- including defendant's failure to offer any vocational evidence -- and that the jurors' award for future pain and suffering and emotional distress was justified by comparison with the results of assertedly comparable cases in which damage awards or settlements equaled or exceeded plaintiff's award. (Pl.'s Mem. 4-8). As for the surveillance tape, plaintiff defends the court's ruling excluding it from evidence for lack of authentication. (Id. at 2-4).

**ANALYSIS**

We address defendant's arguments in reverse order, starting with the challenged evidentiary ruling.[11] Before taking on that

---

[11] We follow this order since upholding defendant's challenge to the exclusion of the surveillance tape would moot the balance

task, we briefly summarize the basic standards for assessing a Rule 59 motion.

I. Rule 59 Criteria

Rule 59(a)(1)(A) provides that the court "may, on motion, grant a new trial on all or some of the issues -- and to any party -- . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Among those traditional grounds for a new trial are errors in the admission or exclusion of evidence, see, e.g., Cameron v. City of New York, 598 F.3d 50, 61-66 (2d Cir. 2010); Tesser v. Board of Educ. of City Sch. Dist., 370 F.3d 314, 318-21 (2d Cir. 2004), although such relief is not to be granted unless the movant demonstrates that the error was not harmless, that is, "[that] 'it is likely that in some material respect the factfinder's judgment was swayed by the error.'" Tesser, 370 F.3d at 319 (brackets in original) (quoting Costantino v. David M. Herzog, M.D., P.C., 203 F.3d 164, 174 (2d Cir. 2000)); see also O&G Industs., Inc. v.

of its motion. See, e.g., Ramirez v. New York City Off-Track Betting Corp., 112 F.3d 38, 40 (2d Cir. 1997) ("A remittitur should be granted only when the trial has been free of prejudicial error.").

National R.R. Passenger Co., 537 F.3d 153, 166 (2d Cir. 2008).[12]

The trial court is also authorized to order a new trial on the basis that the jury verdict is against the clear weight of the evidence. E.g., Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417 (2d Cir. 2012); Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 165 (2d Cir. 1998). In assessing such a motion, the court may weigh the evidence, including witness credibility, "and need not view the evidence in the light most favorable to the verdict winner." Raedel, 670 F.3d at 418 (citing United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)). The Second Circuit has cautioned, however, that "'a decision is against the weight of the evidence . . . if and only if the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice. . . .'" Raedel, 670 F.3d at 417-18 (quoting

---

[12] The harmless-error requirement is incorporated in Rule 61, which states:

> Unless justice requires otherwise, no error in admitting or excluding evidence -- or any other error by the court or a party -- is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

As the Second Circuit has observed, "[a]n erroneous evidentiary ruling that does not affect a party's 'substantial right' is thus harmless." Tesser, 370 F.3d at 319.

Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002)). Consistent with that caution and the principle that trial judges should be very reluctant to second-guess jury assessments of witness credibility, our circuit court has opined that "jury verdicts should be disturbed with great infrequency." Raedel, 670 F.3d at 418 (citing cases).

These caveats are particularly salient when the jury verdict clearly rests substantially or solely on witness credibility. Id. at 418-19. Where the challenge is not to a jury's credibility assessment, but rather to the size of its award of damages, the analysis is somewhat different, although caution remains a watchword.

Under Rule 59(a) the court may overturn an excessive award and either unconditionally order a new trial or condition a new trial on the plaintiff's refusal to accept a reduction, or remittitur, in the award. See, e.g., Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433 (1996); Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 167-68 (2d Cir. 2014); Rangolan v. Cnty. of Nassau, 379 F.3d 239, 243-44 (2d Cir. 2004). A remittitur may be authorized in at least two circumstances:

(1) where the court can identify an error that caused the

18

> jury to include in the verdict a quantifiable amount that
> should be stricken, . . . and (2) more generally, where the
> award is 'intrinsically excessive' in the sense of being
> greater than the amount that a reasonable jury would have
> awarded, although the surplus cannot be ascribed to a
> particular, quantifiable error.

Kirsch, 148 F.3d at 165.


In the absence of a "particular discernible error," as a
general matter the court may not set aside the jury's award as
excessive unless "the award is so high as to shock the judicial
conscience and constitute a denial of justice." Id. (quoting
O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1989)); accord
Turley, 774 F.3d at 162.[13] In assessing whether the award is so
excessive, "the court must 'accord substantial deference to the
jury's determination of factual issues.'" Frank Sloup and Crabs
Unlimited, LLC v. Loeffler, 745 F. Supp. 2d 115, 136 (E.D.N.Y.
2010) (quoting Martell v. Boardwalk Enters., 748 F.2d 740, 750 (2d
Cir. 1984)). That said, and granted that the jury has broad

---

[13] This "shock the conscience" standard applies in cases
involving claims under federal law. When the claim generating a
damages award arises under New York law, the court is to look to
state law for remittitur standards, and that test -- embodied in
N.Y. C.P.L.R. § 5501(c) -- asks whether the award "deviates
materially from what would be reasonable compensation", a
standard that is considered less deferential to jury decisions
than the federal test. See, e.g., Consorti v. Armstrong World
Indus., Inc., 72 F.3d 1003, 1010-12 (2d Cir. 1993). See also
Stampf v. Long Island R.R. Co., 761 F.3d 192, 206-07 (2d Cir.
2014).

discretion in measuring damages, "it 'may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.'" Scala v. Moore McCormick Lines, Inc., 985 F.2d 680, 684 (2d Cir. 1993) (quoting Nairn v. Nat'l R.R. Passenger Corp., 837 F.2d 565, 568 (2d Cir. 1988)). In short, the court must discern "an upper limit" and assess whether the jury has surpassed it. See, e.g., Sloup, 745 F. Supp. 2d at 136 (quoting Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2d Cir. 1961)).

## II. The Surveillance Videotape

During defendant's case, its counsel proposed to offer into evidence a so-called surveillance tape that he represented had been made in its original form by a team of Florida videographers over ten days in July and August 2014 and then edited in unspecified respects, reducing it from three hours to 28 minutes, a process performed by an "audiovisual man" under the direction of defendant's attorney. (Tr. 220-23, 227-28). According to LIRR's counsel, the tape was taken of plaintiff, who had testified that he was currently living in Florida. (Id. at 222, 225-26). Because defendant was proposing to offer the tape without testimonial or other authentication (id. at 222-23) and had also failed to list

20

the item on the joint pretrial order or to provide it during discovery, plaintiff objected. (Id. at 221, 226-27; In Limine Motion at 1-6 [Ex. E to Blumenschein Decl.].[14]

Following oral argument, and in an effort to ensure a comprehensive record, the court reviewed the entire edited videotape, which lasted about 28 minutes. (Tr. 307-08). The edited film portrayed a man who bore at least a strong resemblance to plaintiff. For a portion of the tape, he stood in a bar or juice bar or similar facility, drinking a beverage from a glass that he held principally in his left hand, while occasionally appearing to stroke the back of his neck with his right hand. Then, in a separate segment, the tape showed him walking down the street, holding a small plastic bag or other white object, which at least for some of the time he held in his right hand.[15]

---

[14] Defendant's counsel had apparently provided plaintiff's attorney the unedited tape less than one month before the trial (Sept. 9, 2014 letter from William J. Blumenschein, Esq. to Mark T. Wietzke, Esq. [appended to Ex. E to Blumenschein Decl.]), and plaintiff did not move in limine for its exclusion before trial because he did not learn until mid-trial that defendant proposed to introduce it without authentication. (Tr. 220-21; see In Limine Motion at 4).

[15] It bears mention that in plaintiff's testimony he never suggested that he was incapable of engaging in any of the activities portrayed in the videotape. (See, e.g., Tr. 168-70).

At the conclusion of the viewing and after some additional argument, the court sustained plaintiff's objection. (Id. at 308-12). In doing so, we observed that defendant was proffering the tape without testimony by either the videographer or the tape's editor or anyone else to authenticate it. As for what is required under Rule 901, we noted that the Advisory Committee Notes indicated that reference to the common law is appropriate, see Fed. R. Evid. 901(b), 1972 Advisory Committee Notes at 501 (Thompson Reuters 2015), and on that basis we referred to the New York Court of Appeals decision in Zegarelli v. Hughes, 3 N.Y.3d 64, 781 N.Y.S.2d 488 (2004), which indicated that the requirement of authentication could be satisfied by testimony, whether from the videographer or another competent witness, to the effect "that a videotape truly and accurately represents what was before the camera". Id. at 69, 781 N.Y.S.2d at 491. (See Tr. 310-11). Characterizing defendant's stated position as "treat[ing] this videotape as self-authenticating", we observed that Rule 902, which governs self-authentication, does not cover this type of evidence. (Id. at 311).

As further support for declining to admit the videotape without supporting evidence, we noted that much of the film was

quite blurry[16], and that it had concededly been edited and yet defendant had presented no evidence as to what had been edited out or in. We further noted that current technologies allow for substantial alterations and substitutions of material in videotapes, and that the record was silent even as to whether the tape was digital and thus lent itself to ready manipulation. (Id. at 311).

As for what was observed on the tape, we noted that none of it "was clearly inconsistent with plaintiff's testimony", though we did observe that, with proper authentication, the tape would be sufficiently relevant to be admitted. (Id.). We then sustained the objection. (Id.).

Defendant's attorney then sought to reopen the argument by asserting once again that the jury should be left to judge the tape as is. (Id. at 312). He did not suggest that we had mischaracterized defendant's position that the tape should be admissible without testimonial support, and we simply noted that we had already ruled, and adhered to our ruling. (Id.).

_____

[16] That fact is borne out by still shots from the videotape that defendant has proffered on its current motion. (Blumenschein Decl. Ex. G).

23

Defendant's current challenge to this ruling is groundless. Rule 901(a) states that, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what proponent claims it is." In Rule 901(b), the drafters provide a set of ten "examples . . . of evidence that satisfies the requirement" for various types of exhibits that a party may seek to introduce. Of these evidentiary examples, two seem pertinent here. Of principal relevance in this case, the first listed example refers to "testimony of a witness with knowledge" that "an item is what it is claimed to be". Fed. R. Evid. 901(b)(1). The other pertinent example, listed ninth, refers to "[e]vidence describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(b)(9).[17]

In the companion Rule 902, we find a list of items that are

---

[17] The other eight examples include "Nonexpert Opinion About Handwriting", "Comparison by an Expert Witness or the Trier of Fact", "Distinctive Characteristics and the Like", "Opinion About a Voice", "Evidence About a Telephone Conversation", "Evidence About Public Records", "Evidence About Ancient Documents or Data Compilations" and "Methods Provided by a Statute or Rule". The reference to comparisons by a trier of fact is apparently focused on assessments of handwriting exemplars. See Fed. R. Evid. 901(b)(3), 1972 Advisory Committee Notes at 502 (West 2015). See also United States v. Sliker, 751 F.2d 477, 497-98 (2d Cir. 1984) (discussing court's role in gatekeeping regarding introduction of audio recordings based on voice similarities).

deemed "self-authenticating", that is, "they require no extrinsic evidence of authenticity in order to be admitted." None of these categories encompasses pictographic materials, whether videotapes or photographs or similar items.[18]


Under Rule 901 the courts have consistently adhered to the general proposition -- evident in the wording and purpose of the rule -- that the offering party must provide "sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification." United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991). See, e.g., United States v. Vayner, 769 F.3d 125, 129-30 (2d Cir. 2014); United States v. Whitingham, 346 F. App'x 683, 685 (2d Cir. 2009); United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004); United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001). Because of the particular characteristics of pictographic exhibits -- which may be less than crystal-clear, may depict objects other than what the proponent contends is portrayed, and

---

[18] The listed items include "Domestic Public Documents That are Sealed and Signed", "Domestic Public Documents That are Not Sealed but Are Signed and Certified", "Foreign Public Documents", "Certified Copies of Public Records", "Official Publications", "Newspapers and Periodicals", "Trade Inscriptions and the Like", "Acknowledged Documents", "Commercial Paper and Related Documents", "Presumptions Under a Federal Statute", "Certified Domestic Records of a Regularly Conducted Activity" and "Certified Foreign Records of a Regularly Conducted Activity". Fed. R. Evid. 902(1)-(12).

(especially with the growth of computer-based technologies for
altering the item) may have been altered or manipulated -- the
courts have looked to the requirements of Rules 901(b)(1) and (9)
as defining the base-level burden for their admission into
evidence:

> A party seeking to admit an item into evidence -- whether
> a document, weapon, photograph, audio or video recording or
> other item -- must first establish the item's genuineness.
> Fed. R. Evid. 901. This requires the proponent to "produce
> evidence sufficient to support a finding that the item is
> what the proponent claims it is." Fed. R. Evid. 901. . . .
>
> The admitting party's burden of making a prima facie
> showing that the item is genuine can be satisfied in
> several ways, including the testimony of a witness with
> knowledge or evidence showing that a process or system
> produces accurate results. Fed. R. Evid. 901; see United
> States v. Fluker, 698 F.3d 988, 999 (7th Cir. 2012). For
> video recordings, like tape recordings, the proponent
> should also show that the camera functioned properly, the
> operator was competent in operating the equipment, and the
> recording accurately represented the scene depicted. Cf.
> United States v. Eberhart, 467 F.3d 659, 667 (7th Cir.
> 2006).

United States v. Cejas, 761 F.3d 717, 723 (7th Cir. 2014). See,

e.g., United States v. Ikezi, 353 F. App'x 482, 483 (2d Cir. 2009)

(referring to Rule 901(b)(9) as a basis for authenticating a

videotape); United States v. Castillo Chavez, 555 F. App'x 389,

395-96 (5th Cir. 2014) (upholding the admission of a surveillance

video that had been authenticated by a witness who testified "that

the video was an accurate depiction of the events"); United States

v. Capers, 708 F.3d 1286, 1306-07 (11th Cir. 2013) (videotape and

audio recording). <u>Cf.</u> <u>Arizona Dep't of Law, Civil Rights Division</u> <u>v. ASARCO, LLC</u>, 844 F. Supp. 2d 957, 979 (D. Ariz. 2011) (quoting <u>Lucero v. Stewart</u>, 892 F.2d 52, 55 (9th Cir. 1989)) (authenticating photograph). <u>See</u> <u>generally</u> <u>United States v. Barone</u>, 913 F.2d 46, 49 (2d Cir. 1990) (Government may authenticate tape recording "through the testimony of the technician who actually made it"); <u>United States v. Hemmings</u>, 482 F. App'x 640, 642-43 (2d Cir. 2012) (authentication of audio tapes by agent who recognized voices); <u>Sliker</u>, 751 F.2d at 497-500 (relying on Fed. R. Evid. 901(b)(5) for authenticating voice on the recording); <u>Roy v. Bd. of Cnty. Comm'rs</u>, 607 F. Supp. 2d 1297, 1307 n.24 (N.D. Fla. 2009) (excluding a video clip "because there is no testimony in the record to authenticate it and it is not self-authenticating"). As recently, and helpfully, summarized in a decision quoted by plaintiff:

> The plurality of jurisdictions agree that a video recording may be authenticated by testimony from the operator, recorder, installer, or maintainer of the equipment that the videotape is an accurate representation of the subject matter depicted. 32A C.J.S. Evidence § 1258 (collecting cases). In general, a party may provide proper foundation for the admission of a videotape by providing 1) testimony demonstrating that the videotape fairly and accurately illustrates the events filmed; 2) testimony regarding the checking, operation, and handling of the recording equipment; 3) testimony that the videotape admitted at trial is the same as the one the witness inspected previously, or 4) testimony that the videotape has not been edited and fairly and accurately recorded the actual appearance of the area and events that transpired.

27

<u>James v. Virgin Islands</u>, 2013 WL 6585638, *5 (Sup. Ct. V.I. Dec. 12, 2013) (case cites omitted).[19]

Notably, defendant has been unable to cite any court decisions that have treated videotapes as self-authenticating. This is hardly surprising in view of the limited scope of Rule 902. As noted, the drafters of the Federal Rules of Evidence anticipated that, in specified circumstances, certain types of exhibits may be so evidently that which the proponent claims them to be that they may be deemed authentic without extrinsic evidence. <u>See</u> Fed. R. Evid. 902, 1972 Advisory Committee Notes at 503 (Thompson Reuters 2015). That list -- which is not open-ended -- does not include videotapes, photographs or any pictographic or oral items of evidence.

We acknowledge that there are a handful of cases that, at first blush, appear to suggest that videotapes can be considered

_____

[19] The New York Court of Appeals follows the same approach. Thus it has noted that authentication of a videotape may "normally" be accomplished by "[t]estimony from the videographer that he took the video, that it correctly reflects what he saw, and that it has not been altered or edited . . . . Where the videographer is not called 'testimony, expert or otherwise, may also establish that a videotape "truly and accurately represents what was before the camera."'" <u>Zegarelli</u>, 3 N.Y.3d at 69, 781 N.Y.S.2d at 491 (quoting, <u>inter alia</u>, <u>People v. Patterson</u>, 93 N.Y.2d 80, 84, 688 N.Y.S.2d 101, 104 (1999)).

"self-authenticating." See, e.g., United States v. Hassan, 742 F.3d 104, 132-33 (4th Cir. 2014) (affirming the trial court's finding that "YouTube videos were self-authenticating under Federal Rule of Evidence 902(11)"); United States v. Damrah, 412 F.3d 618, 628 (6th Cir. 2005) ("The district court did not abuse its discretion in holding that the tapes were 'self-authenticating.'"); United States v. Van Sach, 2009 WL 3232989, *3 (N.D. W. Va. Oct. 1, 2009) ("A videotape which clearly identified the persons depicted in it may be self-authenticating.").

We easily distinguish each of these decisions, however. In Hassan, the Fourth Circuit upheld the admission of a YouTube clip under Rule 902(11) -- "Certified Domestic Records of a Regularly Conducted Activity" -- and only because the clip satisfied each of the requirements contained within that rule. 742 F.3d at 132-33.[20] Accord Randazza v. Cox, 2014 WL 1407378, *4 (D. Nev. April 10,

---

[20] Rule 902(11) specifically deems the following to be self-authenticating:

> The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record -- and must make the record and certification available for inspection -- so that the party has a fair opportunity to challenge them.

29

2014) (excluding the transcript of a YouTube clip for failing to meet the requirements of Rule 902(11)). In <u>Van Sach</u>, the Government <u>did</u> call "the custodian of the record . . . to testify that the recording is what the United States claims it is." 2009 WL 3232989 at *3. Thus, that court's description of the admitted video as "self-authenticating" was perhaps somewhat inartful.

<u>Damrah</u> is slightly less off-point, although still ultimately unpersuasive for our purposes. In that case, a number of videotapes depicted relevant scenes from the early 1990s. 334 F. Supp. 2d 967, 984 (N.D. Ohio 2004). The Government had acquired these tapes in 1995 and "edited and spliced" them for purposes of trial. <u>Id.</u> There was no testimony offered that spoke to either the creation of the tapes or their editing. <u>Id.</u> The district court nevertheless admitted the tapes. <u>Id.</u> In that case too, however, there did exist <u>some</u> measure of authenticating evidence to suggest that the tapes depicted what the Government asserted they depicted, including the defendant's own stipulation to the accuracy of Arabic-to-English translations made of the tapes and the Government's proffer of a witness who testified to the identities of some of the individuals shown in the video. <u>Id.</u> This may very well have been sufficient to assure the trial court that "the tapes fairly and accurately (although perhaps not completely) depict the events they purport to

30

depict." Id. at 985. Moreover, despite the Sixth Circuit's characterization of the trial court's ruling as deeming the tapes "self-authenticating,"[21] we note that the trial judge -- in upholding his earlier, at-trial admission of the tapes -- relied entirely on two decisions from the Second and Third Circuits -- United States v. Goldin, 311 F.3d 191, 197 (3d Cir. 2002), and Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973-74 (2d Cir. 1985) -- neither of which stands for the proposition that videos can ever be self-authenticating and both of which make clear reference to the authentication testimony proffered at their respective trials.[22]

Moreover, to the extent that Damrah could colorably be used to argue that, as a general matter, videotapes may be deemed self-

---

[21] The Sixth Circuit appears to be quoting the trial judge himself when it labels the video as "self-authenticating." Damrah, 412 F.3d at 628. It is likely that this terminology stemmed from the trial judge's usage of the term at the trial itself, although no citation is provided. However, we note that the trial judge carefully avoided describing the tapes as self-authenticating in its subsequent decision on a motion for a new trial that was premised, in part, on his earlier admission of the tapes. See Damrah, 334 F. Supp. 2d at 984-85.

[22] We note also that the Damrah panel referred to the trial court ruling as not an "abuse of discretion", reflecting the assumption that the court was not compelled to admit such evidence as self-authenticating. For reasons noted here, see supra pp. 21-22, we found the proffered videotape to be too problematic to be admitted without supporting testimony. See infra pp. 32-33.

authenticating, we note that this proposition is inconsistent with caselaw both in this Circuit and beyond. See supra pp. 25-28. See also Linde v. Arab Bank, PLC, __ F. Supp. 3d __, __, 2015 WL 1565479, *42 (E.D.N.Y. April 8, 2015) ("Videos may be authenticated 'on the same principles as still photographs.'") (quoting Mikus v. United States, 433 F.2d 719, 725 (2d Cir. 1970)). The exclusion of such items from self-authentication is entirely justified in view of the potential for unreliable or even seriously misleading material being presented in this format. Accord United States v. Ida, 1997 WL 122753, *2 (S.D.N.Y. March 18, 1997) ("In view of the strong impact that [video] recorded evidence may have on juries . . . the Second Circuit requires that the government produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings.") (internal quotation omitted).[23]

The justification for the exclusion of these categories of evidence from a rule of self-authentication is well-illustrated in

---

[23] While the "clear and convincing" standard seems to apply only in criminal cases, see, e.g., S.E.C. v. Badian, 822 F. Supp. 2d 352, 364 (S.D.N.Y. 2011), the requirement of authentication applies in civil cases as well, under the less burdensome requirement of providing authentication that is "sufficient to support a finding" that the proffered evidence is what its proponent asserts it to be. See, e.g., Ricketts v. City of Hartford, 7 F.3d 1397, 1410 (2d Cir. 1996).

this case. As noted, the videotape, as offered, was in parts blurry and often shot from what appears to have been a considerable distance, leaving it unclear whether the subject was in all instances in fact the plaintiff and what actions were being portrayed. (See Ex. G to Blumenschein Decl.; Tr. 311). In addition, the film was, as defendant's counsel admitted, heavily edited by his staff (Tr. 221-22), and there was no way -- in the absence of testimony by the editor or someone else with personal knowledge -- to determine how it had been edited and whether portions supportive of plaintiff's case had been deleted.[24] Further, as noted, we were not favored with any information as to the technology involved and whether, given its nature, it lent itself to manipulation of the product, much less whether such manipulation had actually been employed.

Under the circumstances, we properly concluded that defendant had failed to justify introduction of the tape. Indeed, to do otherwise would have been grossly unfair to plaintiff and

---

[24] Presumably, if defendant had produced the tape during the discovery period -- which ended in the Spring of 2014 (or by the latest as of July 1, 2014)(see Docket nos. 9 & 14) -- plaintiff's counsel could have undertaken the necessary inquiries. Defendant chose, however, to delay disclosure (and, indeed, the creation of the tape) until well after the end of that period. (See Sept. 9, 2014 letter from William J. Blumenschein, Esq. to Mark T. Wietzke, Esq.).

potentially highly misleading to the jury.

In an effort to avoid this conclusion, defendant now asserts that authentication could have been achieved if plaintiff himself had been called to testify as to whether the video in fact was of him and whether it accurately portrayed his activities on the days in question. (Deft's Mem. 20). Defendant further asserts that this procedure was in fact utilized in one of the cases cited by defendant's trial attorney during colloquy. (Id. (referring to Tr. 224 (citing Hairston v. Metro-North Commuter R.R., 6 Misc.3d 399, 786 N.Y.S.2d 890 (Sup. Ct. N.Y. Cty. 2004))).

There are two short answers to this argument. First, defendant misreads Hairston, which involved the introduction of a videotape proffered by the plaintiff, to which defendant objected.[25] The court conducted a hearing at which the plaintiff testified as to the accuracy of the tape, and on the basis of that testimony the court allowed her to introduce it over defendant's objection. Id. at 401, 786 N.Y.S.2d at 892. In short, this ruling makes plain that the proponent of the videotape bears the burden of authenticating it,

---

[25] The videotape had been made by defendant and turned over to plaintiff in discovery. Apparently finding it favorable to her case, plaintiff offered it at trial. 6 Misc.3d at 400, 786 N.Y.S.2d at 891-92.

which the plaintiff did in Hairston -- in contrast to our case, in
which defendant failed to do so.


Second, in our case defendant's counsel was free to call
plaintiff as a witness to authenticate the videotape even though
Mr. Leo was not a proponent of the tape, but counsel never sought
to do so. Indeed, counsel made plain throughout our colloquy that
defendant viewed the videotape as self-authenticating, and that no
extrinsic evidence was required. Thus, plaintiff's in limine motion
reflected the understanding that defendant was proposing to offer
the tape without testimonial support (In Limine Motion at 1, 4),
and yet defendant proceeded to argue that the tape was admissible
on that basis. (E.g., Tr. 221-22) (proposing that court simply
review the tape). Moreover, even after plaintiff's attorney pointed
out that the plaintiff in Hairston had chosen to testify to support
her proffer of a videotape (see id. at 226 (plaintiff's counsel
referring to Hairston as demonstrating "there's got to be a body to
create a foundation; it doesn't just come in")), defendant's
counsel never asked to call Mr. Leo. Indeed, after we had reviewed
the edited video, plaintiff's counsel reiterated both the point
that "there's no foundation being offered" and his objection. (Id.
at 308). In response, LIRR's attorney did not disagree or suggest
that he was prepared to lay such a foundation. Rather, he simply

stated that "[w]hat counsel said is really irrelevant." (<u>Id.</u>). Finally, plaintiff's lawyer reviewed some of the cases, "all of which require testimony of some form, even basic foundation. I'm not saying it requires a lot, but there does have to be something." (<u>Id.</u> at 309). Defendant's attorney's only response was to suggest (inaccurately) that these cases were "referring to perhaps the videos that are done in criminal matters. . . . But I don't think that's appropriate here." (<u>Id.</u> at 309-10).

In light of this crystal-clear record, when rendering our oral ruling we articulated defendant's position to be that it could simply proffer the film without authenticating evidence of any kind. (<u>Id.</u> at 311) ("Defendant proposes, in effect, to treat this videotape as self-authenticating."). Notably, although counsel sought to reopen the argument, he did so on the same basis and did not suggest that we had misunderstood his position. (<u>Id.</u> at 312).

Defendant now seeks to avoid the consequence of its trial attorney's quiescence on this point by noting that he had cited <u>Hairston</u> during colloquy before our ruling, and that the <u>Hairston</u> court had held a hearing to assess admissibility, with the plaintiff testifying. (<u>See</u> Deft's Mem. 20, 22). Defendant thus seems to imply that its attorney was subtly signaling that we

36

should hold such a hearing and compel plaintiff to testify. If this is defendant's current argument, it is seriously misguided. As the transcript reflects, in referring to <u>Hairston</u>, defendant's counsel was arguing that there was no need for a videographer's testimony, and he cited <u>Hairston</u> -- and several other cases -- solely for that proposition. (Tr. 224).[26] The court did not dispute that point but rather relied on the fact that defendant was taking the indefensible position that the videotape was admissible without any authentication. Consistent with that posture, defendant's lawyer never asked to call plaintiff, and never so much as hinted that he wished to do so.

At base, then, defendant appears implicitly to be arguing that the court should <u>sua</u> <u>sponte</u> have called plaintiff to testify for defendant on <u>voir</u> <u>dire</u> or should have made that suggestion to defendant's attorney. Plainly neither proposition is correct. The court functions as a neutral arbiter, and it goes beyond its role if it takes on the obligation of either counseling a litigant, particularly one that is being represented by a presumptively

---

[26] In any event, as noted, the plaintiff in <u>Hairston</u> was the party seeking to introduce the videotape, and hence she testified in support of her own application. 6 Misc.3d at 401, 786 N.Y.S.2d at 892.

competent attorney, or advising that attorney.[27]

In sum, defendant's motion for a new trial, insofar as it is premised on the court's evidentiary ruling, is denied.[28]

III. <u>The Damages Awards</u>

Defendant asks the court to require plaintiff to accept a smaller award for future lost earnings and future pain and suffering (including emotional distress) or else face a new trial on damages. (Deft's Mem. 15-18). In assessing these challenges, we apply the federal standard, which, as noted, asks whether the jury's award is so unreasonable in light of the evidence as to "shock the judicial conscience and constitute a denial of justice." <u>E.g.</u>, <u>Turley</u>, 774 F.3d at 162; <u>Anderson v. Metro-North R.R. Co.</u>,

_____

[27] We note that the court was fully aware at the time that one option for defendant was to call plaintiff to testify, but whether to do so was of course a matter for defendant's attorney to decide.

[28] In view of the meritlessness of defendant's evidentiary argument, we need not decide whether the error that defendant purports to discern was harmless. That said, given the substance of the tape, if called upon to determine that question, we would find that the tape would, in all likelihood, not have affected the verdict since the actions that the tape portrayed were not inconsistent with plaintiff's own testimony as to his physical limitations.

493 F. App'x 149, 151 (2d Cir. 2012). <u>Accord</u>, <u>e.g.</u>, <u>Nairn</u>, 837 F.2d at 567. We first address the award for future lost income.


    A. <u>Future Earnings</u>


    In assessing the verdict of $2,000,000.00 in future lost income, we start by noting that the award seems plainly to have been premised on certain fact-finding by the jury. The justification for those findings -- which are implicit in the amount awarded -- depends of course on the nature and extent of the evidence before the jury. Since the jury's verdict parallels the calculations that plaintiff's counsel proffered to the jury on summation (Tr. 404-06; Ballaine Decl. Ex. I), we start with plaintiff's contentions at trial on this issue and the evidentiary basis for them. We then determine whether the jury findings rest on discernible errors in calculation or on factual assumptions that are unsupportable in light of the evidentiary record.


    Based on the current collective bargaining agreement (PX 12) and the pay data from plaintiff's personnel file (PX 27), plaintiff calculated his weekly wages, with built-in periodic adjustments, for the period starting at the time of trial and ending in 2040,

when he would have attained age 60. (See Ballaine Decl. Ex. I).[29]
He further assumed that, although he was an assistant signalman at
the time of the accident -- a position for which plaintiff would
only have been able to work for a limited number of years -- had he
not been injured, he would have been approved as a permanent
signalman at the end of his four-year probationary term, in about
April 2012. (Tr. 174-75, 405-06). Based on that assumption,
plaintiff calculated his loss of future income -- not including
lost benefits[30] -- as $2,014,212.54. (Id. at 405-06). We infer that
the jury adopted these postulates as the predicate for its $2
million verdict. Moreover, since the jurors were instructed to take
into consideration whether plaintiff could have mitigated his
damages by other work (id. at 431-33), we infer that they
implicitly found that, with his damaged hand, his limited education
and background as a track worker doing heavy labor, as well as his
history of unsuccessful job searches post-accident, he was unlikely
to find other employment in the future to offset, in whole or in

---

[29] The parties had agreed that the jury should be instructed
that plaintiff's work-life expectancy was 25.7 years, and the
jury was so instructed. (Tr. 344-45; see id. at 435-36). That
span was consistent with plaintiff continuing to work until 2040.

[30] Plaintiff eschewed an attempt to recover for such benefits
-- including pension and medical insurance -- since he did not
call an economist to testify as to the quantification of that
loss or otherwise proffer the evidence needed for such a
calculation. (See Tr. 406-07)

part, his loss of income from the railroad.

In challenging these implicit findings, defendant does not quarrel with plaintiff's calculation of what he would have earned if he had remained in the railroad's employ as a signalman until age 60. It does argue, however, that the jury verdict founders on several unsupportable findings.

Among other points, defendant asserts that the evidence strongly suggests that, even if not injured, Mr. Leo would not have kept his job for very long, because of a 2010 conviction -- prior to the accident -- for aggravated Driving While Impaired ("DWI"). (Deft's Mem. 17-18; see Tr. 175-78, 188-92, 231). According to defendant, that conviction triggered the requirement that, for a three-year period ending in 2013, an interlock device be placed on any vehicle that plaintiff drove (Deft's Mem. 17-18 & n.5 (citing N.Y. Penal Law § 65.10(2)(k-1)), and a witness for the railroad -- plaintiff's supervisor, Mr. John Hanania -- testified on second-hand information that the railroad's trucks did not have such a device. (Tr. 230-31). Since plaintiff was assertedly required by the LIRR to obtain a commercial driver's license ("CDL") by the end of his fourth year of employment -- in Leo's case, by April 2012 -- so as to be able to operate those trucks, defendant asserts that he

41

would inevitably have been denied permanent employment status in or about April 2012. (Deft's Mem. 18).

Alternatively, defendant notes that the jury, by awarding the full amount of plaintiff's estimated future earnings as a signalman (or lineman)[31] till age 60, implicitly found that plaintiff in his post-accident condition would likely not be able to obtain substitute employment with reasonable efforts. The jury was instructed to take into account the expected results of such mitigation efforts, and defendant contends that it improperly failed to do so since the notion that plaintiff, who had a high-school degree and some college experience, could not find a job over the next 25 years was too implausible. (Deft's Mem. 17-18; Deft's Reply Mem. 7).

In addition, defendant observes that plaintiff's calculation of his undiminished earnings to age 60 did not take into account income taxes, and accordingly, it says, the jury's adoption of plaintiff's figure without modification was flawed. On that point, defendant observes that the court instructed the jurors to award a

---

[31] At trial, Mr. Hanania clarified that the railroad uses the job titles of "signalman" and "lineman" interchangeably. (Tr. 228).

post-tax figure for lost earnings, and it asserts that they apparently failed to do so. (Deft's Mem. 16, 18; Deft's Reply Mem. 7).

We address each of defendant's arguments in turn,[32] starting with its contentions premised on plaintiff's DWI conviction. There is less to this than meets the eye.

Plaintiff advised the railroad of his 2006 arrest and the subsequent conviction and sentence in March 2010. (Tr. 175-76, 189-90). There is no dispute that in 2010 he was placed on probation and that as part of his sentence he was authorized to hold a conditional driver's license that required him to have a so-called interlock device placed on his personal car. (Id. at 174-77). There is also no dispute that this license condition was to last for three years -- presumably until March 2013. (Id. at 176). Testimony by an LIRR representative -- Mr. Hanania -- established, also

---

[32] We note that, in awarding future lost income, a jury or the court is normally required to discount that total to present value. See, e.g., Ramirez, 112 F.3d at 42-43. In this case, however, at the charge conference defendant's counsel waived any discount, and the parties therefore stipulated that no discount would be calculated. (Tr. 342-44). Accordingly, defendant does not challenge the future-income verdict on the basis that it represents an undiscounted total of projected future wage loss.

without dispute, that for an assistant signalman to achieve permanent signalman status, he must acquire a CDL within four years after he was initially hired -- in plaintiff's case approximately in April 2012 -- and that a failure to do so would normally trigger termination. (Id. at 229; see id. at 174; PX 9).

From this congeries of evidence, defendant seems to argue that plaintiff was not in a position to obtain the required CDL by the end of the mandated four-year period or to drive LIRR trucks, because those vehicles did not have an interlock device, and that he would therefore have been terminated by approximately April 2012, some time before the expiration of the interlock license condition. (Deft's Mem. 17-18). This argument, which defendant's counsel pressed on summation (Tr. 366-68, 369), fails at several places for purposes of its new-trial motion.

First, although defendant asserts that the condition on plaintiff's license precluded his driving LIRR trucks without an interlock device, the record does not compel that assertion. Indeed, the only competent evidence about the nature of the license condition came from plaintiff himself, and he explicitly testified

that the condition concerned only his own car. (Id. at 177).[33]
Whether that testimony was credible was for the jury to decide, and
in the absence of any contrary evidence the jurors' presumed
decision to credit his testimony cannot be second-guessed on a new-
trial motion.[34]

Second, although defendant seemed to imply that the presence
of the condition on plaintiff's regular driver's license would
preclude his obtaining a CDL, it offered no evidence of that

_____

[33] Neither party offered any documentation of the terms of
plaintiff's sentence and licensure.

[34] On defendant's current motion, it cites N.Y. Penal Law §
65.10(2) (k-1) as support for its contention that during
plaintiff's probation he was not allowed to drive any vehicle
without an interlock device. (Deft's Mem. 17-18 n.5). At trial,
however, it never offered any evidence of that provision to the
jury and also did not request a jury instruction as to the fact
or significance of that provision.
   Additionally, without wading deeply into a discussion of
this provision, we note that defendant quotes it for the
proposition that "the N.Y. Penal Law unambiguously provides that
a 'functioning interlock device' must be installed and maintained
'in any vehicle owned or operated by the defendant." (Deft's Mem.
17-18 n.5 (quoting N.Y. Penal Law § 65.10(2)(k-1) (emphasis in
defendant's brief)). Yet, despite defendant's labeling of this
statute as unambiguous, defendant conveniently omits the second-
half of the very sentence it quotes, namely, that the interlock
device be installed "in any vehicle owned or operated by the
defendant if the court in its discretion determines that such a
condition is necessary to ensure the public safety." N.Y. Penal
Law § 65.10(2) (k-1) (emphasis added). Without any evidence about
the degree to which plaintiff's sentencing judge exercised that
discretion, we are in no position to contradict plaintiff's
account of his sentence.

asserted fact, much less evidence sufficient to preclude the jury from finding otherwise.[35] The only competent testimony was by plaintiff, who insisted that he could have obtained a CDL. (Id. at 177, 190). In now pursuing the contrary argument, defendant cites the testimony of Mr. Hanania, but all that he testified to was that the LIRR required an assistant signalman to obtain a CDL for promotion to signalman, and that LIRR trucks did not have an interlock.[36] (Id. at 229, 230-31). He did not testify that a driver in plaintiff's circumstance could not obtain a CDL, whether with or without the condition of an interlock.

Third, defendant offered no evidence suggesting that if plaintiff could have obtained the required CDL but could not drive the railroad's trucks because of the interlock condition on his own license, he would have been terminated. All that Mr. Hanania stated was that a CDL was required at the end of four years of employment as an assistant signalman, not that the employee had to be in a

---

[35] At most, the jury might have found that if plaintiff obtained a CDL before March 2013, it would have included the same interlock condition, but defendant never proffered evidence to support that assumption or explicitly argued it to the jury. Rather it argued that plaintiff could not have obtained the CDL in time. (E.g., Tr. 367-68).

[36] It bears noting that Mr. Hanania admitted that he had no personal knowledge as to whether the LIRR had an available interlock device. (Tr. 230-31).

position at that time to drive LIRR trucks. (Id. at 229-30).
Indeed, the only evidence on this point came from plaintiff, who
testified that one could perform the required work of the signalman
without driving a truck since he could bid for a non-driving job
and other members of his group could do the driving. (Id. at 189).[37]
Again, the credibility of this testimony was for the jury to weigh,
and in the absence of specific testimony to the contrary, the
jurors were free to credit plaintiff's version.

Fourth, even assuming that the LIRR did not possess an
interlock device at the time of trial -- an assertion that Mr.
Hanania offered based on his having seen an email from some
unidentified person (id. at 230-31) -- defendant offered no
evidence that, if presented with the plight of a competent
assistant signalman at the end of his four-year term in plaintiff's
circumstances (that is, able to obtain a CDL, albeit with a
condition of an interlock for a limited period of time beyond his

---

[37] It also bears mentioning that plaintiff's exhibit 9 -- the
"Job Specifications Form" promulgated by the LIRR for the
assistant signalman position -- states as follows: "Failure to
qualify as a Signalman within the four (4) year training program
will result in termination of employment. Qualification as a
Signalman requires at a minimum qualification as a mechanic
(signalman) via line test, obtain a CDL class "B" license, and be
an employee in good standing." This stated list of minimum
requirements makes no mention of the specific need to drive the
truck.

four-year term as an assistant signalman) the railroad would have been unable or unwilling to acquire the device for that time period. Defendant also offered no evidence that in such a situation the railroad would have been unwilling to delay the retention decision for the limited time period until the license condition expired. The jurors were free to weigh this lack of evidence by defendant and reject the inference that the LIRR was inviting them to draw -- that the interlock condition on the plaintiff's drivers license meant that plaintiff would automatically be terminated as of April 2012.

Indeed, on the last point, plaintiff testified that, in his experience, the four-year deadline to obtain a CDL could be extended, implying that the railroad's stated deadline was applied more flexibly than defendant suggested. (Id. at 187-88). In plaintiff's case the gap between his four-year deadline of April 2012 and the expiration of the license condition in March 2013 was only eleven months, permitting the inference that the railroad would have given him the necessary slack. Although the testimony of Mr. Hanania could be read as suggesting that the rule was inflexible, the jury was free to choose whom to credit on this point. Moreover, the fact that the railroad retained plaintiff as an assistant signalman for more than a year after his conviction

48

and sentence -- and until his injury -- despite being on notice of the license condition imposed at sentence (see id. at 190), may well have influenced the jury's assessment of this particular dispute.[38]

In sum, the jury's implicit finding that, but for the injury, plaintiff would have remained in the employ of the railroad until age 60 was sufficiently grounded in the evidence to survive Rule 59 scrutiny.[39]

----

[38] Defendant might counter that the requirement for a licensed ability to drive trucks did not apply until the employee had spent four years in its employ, and hence there was no reason to terminate plaintiff early. Though it is evident that the policy was to require a CDL only at the end of four years of employment (Tr. 229), a jury might view that point as less than decisive. The LIRR was apparently aware in 2010 (id. at 190) that plaintiff had a three-year condition on his license that would -- according to defendant's assertion in this case -- unavoidably preclude his obtaining a CDL within the four-year window, thus ensuring that he would inevitably be terminated. If so, the jurors might infer, the railroad would have had reason to drop plaintiff early as an assistant signalman, since he would never attain permanent status and his training period would be wasted. Since the LIRR did not do so and apparently never communicated to plaintiff that he was slated for such termination (id.), the jurors might further reason that it was likely that plaintiff's supervisors had decided that his termination at the end of four years was not inevitable and that the license requirement might be delayed until the expiration of the interlock requirement eleven months later, or otherwise finessed.

[39] Defendant also alludes to the fact that on one occasion plaintiff was suspended by his supervisor for disciplinary reasons -- specifically on the basis that he had taken a day off on the false pretense that he needed psychological treatment for

The more difficult question is posed by defendant's second challenge to the front-pay award. As noted, defendant observes that the jury appears to have awarded a sum that rests on the assumption that plaintiff will never be able to acquire employment that would offset -- in whole or in part -- his lost income from the LIRR. Defendant suggests that this finding is so unsupported by evidence or common sense as to justify a substantial reduction in the $2 million award. (Deft's Mem. 16-17; Deft's Reply Mem. 7).

We start by noting the relative thinness of the record on this topic. The evidence reflects an injury to plaintiff's fingers on his dominant hand that is permissibly viewed as permanent (see, e.g., Tr. 93), and as significantly depleting the strength of his right-hand grip (see, e.g., id. at 95), and precluding his doing heavy labor, which is the scope of his work experience (see, e.g., id. at 137), both at the LIRR and before. Plaintiff's education was confined to high school and a few college courses (see, e.g., id. at 136), and there is little or no evidence as to his potential job skills for less demanding work. In addition, the jury had before it

---

his grief over the loss of a friend years before in the 9/11 disaster. (Tr. 241-42). That one sanction -- which apparently was not even mentioned in plaintiff's personnel file (id. at 242-44) -- was subject to assessment by the jury, which could also take into account the fact that the same supervisor testified that plaintiff was otherwise an "average" employee. (Id. at 242).

testimony by plaintiff as to his efforts to obtain alternative work -- focused on sales positions -- an account that was short on details but did mention the names of some of the companies that he had contacted in an as-yet unsuccessful effort to find a replacement job. (Id. at 166-69). Finally, plaintiff offered his account of his effort to obtain assistance from the railroad in obtaining a position with it in less demanding roles (id. at 165-66, 170-71), an effort that the jury was free to find would likely be futile in view of the heavy demand for such jobs and the conceded refusal of the railroad to offer its injured employees any priority in obtaining one of them. (Id. at 299-300).

Missing from the trial record is any testimony by a vocational expert (or anyone else) as to plaintiff's residual capacities and their match to existing jobs in the market (whether locally or in Florida or anywhere else). Also absent was any clarifying testimony as to whether plaintiff was continuing his job searches as of the time of trial.

With that record before the jurors, we instructed them as to the requirements for mitigation of damages, both past and future (id. at 432-33), and they arrived at a verdict evidently premised on the notion that reasonable job efforts would likely not result

in any alternative employment for plaintiff. As noted, defendant contends that this finding was indefensible, because it either ignored the mitigation requirement or else was unsupported by the record. (Deft's Mem. 16-17; Deft's Reply Mem. 7). In response plaintiff contends (1) that the verdict was defensible given the record, which permitted the finding that no jobs would likely be forthcoming, (2) that the jury may have permissibly found that the award should include some additional amount for lost benefits -- the fact, though not the value, of which was testified to by plaintiff -- and (3) that the jury may have determined that plaintiff would have worked past age 60 but for the injury and thus measured lost wages for a longer time frame despite plaintiff's testimony that he planned to work only to age 60. (Pltff's Mem. 4-5).[40]

Beyond this information, neither side offered any evidence as to plaintiff's job prospects. Thus defendant simply relies on the notion that someone in plaintiff's position, even with a weakened dominant right hand, limited education, and job experience restricted to heavy labor, should be able at some point to obtain

---

[40] Plaintiff also appears to suggest that the jury may have accounted for wage increases not reflected in plaintiff's counsel's chart of future earnings. (Pltff's Mem. 4).

some form of employment, even if less remunerative than the position that he lost as a result of the accident. Plaintiff, as noted, emphasizes the broad discretion of the jury to assess future job prospects and the failure of defendant to offer any evidence that jobs that matched plaintiff's reduced skills were available in sufficient numbers to compel the inference that he likely would be hired before age 60.

We are not persuaded by plaintiff's argument that the jury award may have encompassed the jurors' estimate of the value of fringe benefits lost by plaintiff. Plaintiff failed to proffer any evidence of such value, and thus failed to carry his burden to show this aspect of his damages with sufficient specificity. See, e.g., Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 22-23 (2d Cir. 1996) (citing Sales v. Republic of Uganda, 828 F. Supp. 1032, 1042 (S.D.N.Y. 1993); Gorrill v. Icelanair/Flugleidir, 761 F.2d 847, 855 (2d Cir. 1985). Compare, e.g., Stratton v. Dep't for the Aging for the City of New York, 132 F.3d 869, 882 (2d Cir. 1997); Okraynets v. Metropolitan Transp. Auth., 555 F. Supp. 2d 420, 444-49 (S.D.N.Y. 2008). Cf. Sharkey v. Lasmo, 214 F.3d 371, 376-77 (2d Cir. 2000) (Holcomb, C.J., concurring in part). Thus we have no reason to infer that the jury took a wild guess as to what that number would be, and had it done so that verdict would likely have

been improper. At most, we may surmise that since the jurors heard testimony that, if plaintiff had stayed in his job, he would have had a pension and health insurance, they may fairly have been willing to give him the benefit of any doubts as to the amount of his lost future wages.

We also see no basis for plaintiff's assertion that the jurors may have done a calculation on the assumption that plaintiff would have stayed in the job past 60 years of age. There was no basis for such an assumption, which was contrary to plaintiff's own testimony. (Tr. 141). Moreover, the stated physical demands of the job strongly suggested that it would have been difficult for plaintiff, or any other employee in his position, to satisfy those criteria past his projected age for retirement.

There still remains the question of whether it was defensible, on the current record, for the jury to determine that plaintiff would probably not be able to obtain alternative employment in the future. The question is whether that finding was against the clear weight of the evidence, with due consideration for the deference to be shown jury findings. See, e.g. Elyse v. Bridgeside, 367 F. App'x 266, 268 (2d Cir. 2012); Slack v. Cnty. of Suffolk, 50 F. Supp. 3d 254, § II(A)(2) (S.D.N.Y. 2014).

At the outset, we note that while the plaintiff has the obligation to mitigate his damages, the defendant bears the burden "to demonstrate that the plaintiff could, with reasonable effort, have so mitigated his damages." Marasa v. Atlantic Sounding Co., 557 F. App'x 14, 19 (2d Cir. 2014) (citing Jones v. Consolidated Rail Corp., 800 F.2d 590, 593 (6th Cir. 1986)).[41] Accord, e.g., Schneider v. Nat'l R.R. Passenger Corp., 987 F.2d 132, 136 (2d Cir. 1993); Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp., 2003 WL 25835939, *2 (S.D.N.Y. Oct. 30, 2003). Although this wording addresses past efforts by the plaintiff to seek substitute employment, the same burden applies to evidence concerning the plaintiff's future job prospects. See, e.g., Harrington v. Atlantic Sounding Co., 916 F. Supp. 2d 313, 326-27 (E.D.N.Y. 2013), aff'd mem. sub nom. Marasa v. Atlantic Sounding Co., 557 F. App'x 14 (2d Cir. 2014) (awarding undiminished future wages based on defendant's failure to meet its burden of showing available jobs that plaintiff could perform; ruling made despite defendant's proffer of vocational expert). Accord Russell v. Nat'l R.R. Passenger Corp., 189 F.3d 590, 596 (7th Cir. 1999) (affirming FELA jury instructions that placed the burden on defendant to show that future damages

---

[41] Although Marasa involved a claim under the Jones Act, 46 U.S.C. § 50101 et seq., the circuit court applied precedent from the FELA.

"might have been lessened by [plaintiff]"). Indeed, the rule that an FELA defendant bears the burden on mitigation in the context of both past <u>and</u> future pay was expressly confirmed by the Sixth Circuit in <u>Jones</u>, 800 F.2d at 593-94, and the Second Circuit has explicitly blessed that decision as "the governing legal standard for the duty of mitigation of damages in FELA cases." <u>Schneider</u>, 987 F.2d at 136.

The evidence in this case was plainly sufficient to permit the jury to find that plaintiff had made reasonable efforts, under the circumstances, to obtain alternate employment in the approximately three years that had passed between his accident and the trial. Indeed, defendant has not challenged the jurors' finding regarding past lost income, and we conclude, further, that the jury's implicit finding that suitable employment in the future is not likely was also permitted by the evidence.

We start by noting that plaintiff testified that his job experience prior to the accident involved not only the very heavy exertional demands of the LIRR signalman position -- requiring that he climb a pole up to 90 feet while holding as much as a 70-pound weight in one hand (Tr. 158-59; PX 9 at p.2) -- but also equivalent requirements for heavy lifting with both hands in his preceding job

with Cablevision (Tr. 167), and heavy lifting at his still earlier job at Sea Coast Distributors, where he was involved in warehouse work and delivery of maritime parts. (Id.). Indeed, he reported that all of his prior work had involved using both hands to "lift things". (Id.).

The evidence also showed that as a result of his accident, he was greatly limited in his ability to lift with his right hand, and indeed that he was unable to lift significant weights even using both hands. Thus the LIRR Healthcare Work Capacity Report, prepared at the time that the LIRR separated him permanently from his signalman job, reported a "poor right grip" due to "non functional use of [his] third, fourth and fifth fingers" on his right, or dominant, hand. (PX 26 p. 197 (Sept. 5, 2013 Work Capacity Report signed by Mr. Freddy Ho)).[42] Notably, in summarizing his ability to lift, the assessor reported that plaintiff could lift from the waist to the shoulder no more than 25 pounds, and only with two hands together, and could use only his left hand for "overhead activities" and opening train doors. (Id.). Indeed, the Human Resources representative charged with dealing with plaintiff's

---

[42] Mr. Ho was a physical therapist in the LIRR Medical Department and conducted the functional capacity examination of plaintiff. (Tr. 297).

possible transfer to other LIRR jobs -- Mr. Geollorenzo -- conceded that plaintiff was limited to lifting only ten to fifteen pounds and had typing restrictions (Tr. 297-98), necessarily implying other limitations on manipulative skills with his dominant hand.[43]

As for plaintiff's efforts to obtain alternative employment, he testified to having engaged in what he described as an intensive search in the three years before trial for a job that would not involve significant lifting. He mentioned a number of companies that he had contacted for sales-type jobs -- including, as examples, Geico, Sprint, Modells, P.C. Richards, and Barnes & Noble -- and "every application I could fill out or look at on the Internet." (Id. at 168). As he reported, the places that he had contacted, either on-line or in person, required typing skills, presumably to input orders in a database, and because of his hand problem he could not meet their requirements. (Id. at 167-69). In

_____

[43] In defendant's motion, they suggest at one point that plaintiff failed to obtain alternative work involving typing because he had not bothered to learn the skill. (Deft's Mem. 17) ("[T]here is absolutely no reason to believe he cannot, through modest effort, improve his typing speed the old-fashioned way -- through practice."). The evidence, however, suggested that plaintiff's shortfall in this respect was attributable to his injury, not a disinclination to practice, and the jury was certainly permitted to so interpret the evidence and to find that his lack of finger strength was, as Dr. Pallotta testified, not remediable.

the same vein, plaintiff also mentioned that, after moving to
Florida, he had lined up what he thought might be a viable job in
telemarketing sales, at an entity known as ACG, but he ultimately
was not hired because he could not meet the company's typing
requirements. (Id. at 185). Notably, on cross-examination defendant
did not challenge plaintiff's account as to the extent and
intensity of his job-search effort.

The record also offered adequate evidence to permit a finding
by the jury that the LIRR was not a realistic source of other
employment for plaintiff. The LIRR Work Capacity Report listed, as
possible viable positions within the railroad, "travel information
clerk, usher and ticket clerk/agent." (PX 26 p. 197 (Sept. 5, 2013
Work Capacity Report signed by Mr. Freddy Ho)). Plaintiff, however,
testified that he had communicated with the Human Resources
representative, Mr. Giallorenzo, who had mentioned these types of
jobs to him, but had never contacted plaintiff subsequently to
advise him of any available positions, although he had referred
plaintiff to the railroad website for listings. (Tr. 165-66; see
also id. at 291-92). Although there was a conflict between the two
men as to whether plaintiff ever sent his resume to Mr. Giallorenzo
(see id. at 292, 295) -- assertedly a prerequisite for any Human
Resources assistance despite the fact that plaintiff was already an

employee of the railroad -- the jury was free to credit plaintiff's version. Moreover, plaintiff testified without contradiction that he never had any communications from Human Resources about job openings, including openings for light work. (Id. at 163, 170-71). In addition, Mr. Giallorenzo conceded that he was unaware of whether, during the pertinent time, the types of jobs mentioned in the LIRR report were actually posted on the website or the number of such postings, if any, and, still more pointedly, he reported that (a) the railroad received as many as 2,000 applications for each posted job opening on the website and (b) does not give any priority to injured LIRR employees, such as plaintiff, who are looking to shift to less demanding positions. (Id. at 297-300). As noted, this record fully justified the implicit finding of the jury that the LIRR was not a meaningful source for alternative employment of plaintiff.

Defendant also did not proffer any evidence as to plaintiff's residual functional job capacities (other than the notation in the capacity report about information and ticketing clerks) and did not address -- whether by testimony of a vocational expert or in any other form -- the availability of jobs that plaintiff had a realistic chance to obtain, much less perform. On this record we conclude that the jurors' conclusion that plaintiff was not likely

to obtain employment in the future to replace in whole or meaningful part the wages that he had lost as a result of the accident was not contrary to the clear weight of the evidence. <u>See</u>, <u>e.g.</u>, <u>Harrington</u>, 916 F. Supp. 2d at 326-27.

In seeking remittitur on this issue, defendant suggests that it is implausible that in the next 25 years plaintiff will be unable to find substitute work. It then proffers the figure of $700,000.00 as a defensible measure of future lost income, although it offers no explanation of the basis for this sum. (Deft's Mem. 18). We are not persuaded that this figure reflects the most that the jury could reasonably award.

First, as noted, plaintiff's entire work history required him to perform physical functions that he apparently was no longer able to do after his injury. (Tr. 158-59). Second, that physical limitation appears to have precluded him from alternative, lower-exertion jobs that he had sought in the interim, because they generally required manual dexterity that he no longer had. (<u>Id.</u> at 168). Third, the record does not reflect that plaintiff had the education, training or experience for white-collar jobs that might otherwise be available in the economy, and in any event the record is entirely silent as to what categories of jobs might, as a

practical matter, be accessible to him, even assuming he were retrained for them. Fourth, the jurors were presumably aware of the fact that in recent years the American economy has experienced a sharp reduction in jobs for workers with limited skills and education, and an inability to perform heavy exertional work activities, and that the overhang of large numbers of unemployed workers in this category would make job acquisition still more challenging. See, e.g., Megan McArdle, What's in Store for America's Workforce?, BLOOMBERGVIEW (March 25, 2015, 8:00 AM), http://www.bloombergview.com/articles/2015-03-25/what-s-in-store-for-america-s-workforce-; Susan Adams, New Report: 90 Million Low-Skilled Workers to be Out of Work for Good, FORBES (June 20, 2012, 3:51 PM), http://www.forbes.com/sites/susanadams/2012/06/20/new-report-90-million-low-skilled-workers-to-be-out-of-work-for-good/.[44] Fifth, the jurors could well have relied in part on the fact -- addressed with some frequency in the media -- that individuals who are out of the work force for extended periods of time and do not possess readily marketable skills are still less likely to

---

[44] These broader vocational factors were not addressed in the record, a failing that presumably must be attributed to defendant's failure to make a meaningful showing on the mitigation issues that are part of its burden. In any event, the jurors were properly instructed to use their "common sense" in their deliberations (e.g., Tr. 416), and may be expected to call upon their own experience and knowledge on these contexual facts when assessing the persuasiveness of each side's arguments.

obtain new employment in a national job market that remains quite weak. See, e.g., Angelo Young, _Despite Falling US Unemployment, Numbers of Long-Term Unemployed and Those Who've Given Up on Work Remain High_, INT'L BUSINESS TIMES (Jan. 9, 2015, 3:30 PM), http://www.ibtimes.com/despite-falling-us-unemployment-numbers-long-term-unemployed-those-whove-given-work-1778990; Don Lee, _Long-term unemployment still at record levels_, LA TIMES (Sept. 10, 2014, 5:00 AM), http://www.latimes.com/business/la-fi-longterm-jobless-20140910-story.html#page=1; Alan Krueger, Judd Cramer & David Cho, _Are the Long-Term Unemployed on the Margins of the Labor Market?_, BROOKINGS (Spring 2014), http://www.brookings.edu/about/projects/bpea/papers/2014/are-long-term-unemployed-margins-labor-market. See also Joe Weisenthal, _The Massive Difference in Unemployment Between Those Who Do and Don't Have a College Degree_, BUSINESS INSIDER (June 8, 2013, 6:50 AM), http://www.businessinsider.com/college-vs-no-college-unemployment-rates-2013-6. Sixth, the jurors observed plaintiff testifying at trial, and were free to make their own assessment as to how compelling a job candidate he would likely be in a competitive job market for which he notably lacked key skills. Depending on their sense of how he would present in a job interview -- assuming he got that far -- they might well have viewed him as less likely to impress than others with whom he would have been competing for a

limited number of jobs involving at least some skill requirements.[45]

In sum, notwithstanding the fact that, even with a very skimpy trial record, a perfectly plausible argument could have been made that, with reasonable efforts, plaintiff would be likely to obtain some sort of job at some level of compensation, the jurors could permissibly have found -- as they apparently did -- that it was more likely that plaintiff would fail in such a continued job search. See, e.g., Harrington, 916 F. Supp. 2d at 326-27 (defendant presented testimony of vocational expert; court nonetheless awarded seaman undiminished future wages for expected work-life based on inability to return to old job and lack of proof by defendant of skills for less demanding and available work).[46]

---

[45] The jurors may also have been sensitive to the apparent fact that job applicants with disabilities may be viewed as less competent irrespective of whether their disabilities objectively limit their ability to perform job-related functions. See Eva Louvet, Social judgment toward job applicants with disabilities: Perception of personal qualities and competencies, Rehabilitation Psychology 52(3) (2007), http://psycnet.apa.org/journals/rep/52/3/297/.

[46] It bears mention that the court in Harrington/Marasa awarded plaintiff his undiminished future wage loss even though defendant demonstrated the availability of light work in plaintiff's geographic area and the mean salary for those jobs, and even though plaintiff had made no effort to secure alternative employment. The court based its award on plaintiff's back injury, though it had been improved by surgery, and -- with respect to the proffered job category of Information and Records Clerk -- the fact that "plaintiff ha[d] no computer skills". 916

There remains one item to be addressed in connection with this award. As defendant notes, the jury, though instructed to award a post-tax amount (Tr. 432), appears not to have done so. Instead, the jurors adopted plaintiff's calculation of his expected pretax wages. (Compare Tr. 405-06 with Tr. 447). In resisting defendant's argument, plaintiff notes that defendant offered no evidence as to tax rates, implying that as a result the award should not be altered to account for this omission. (Pltff's Mem. 5).

Plaintiff does not directly argue that the absence of specification to the jury of current applicable tax rates would necessarily preclude the jurors from estimating a figure for income taxes on annual wages of approximately $75,000.00.[47] It appears that the jury simply failed to take this step, and since the measurement of this deduction is subject to ready, if approximate, calculation,

---

F. Supp. 2d at 327. Although Harrington was 52 at the time -- substantially older than Leo, who is now 34 -- it was his physical limitations and the absence of proof that he could meet the job requirements proffered by the vocational expert that formed the basis for the award. Here, of course, defendant has failed even to attempt to make such a vocational showing.

[47] As plaintiff observes, the total amount awarded by the jury, based on a 25.7 year work-span, amounts to an average of $77,821.00 per year. (Pltff's Mem. 4).

we undertake that calculation here.[48] <u>Accord</u> <u>Johnson v. Union Pacific R. Co.</u>, 2007 WL 2914886, *5 (D. Neb. Oct. 4, 2007) ("A prevailing FELA plaintiff is entitled to recover his after-tax income losses."); <u>Prater v. Consol. Rail Corp.</u>, 272 F. Supp. 2d 706, 716 (N.D. Ohio July 16, 2003) ("[T]he jury must compute plaintiff's lost wages on an after-, rather than a pre-tax basis.) (citing <u>Norfolk & W. Ry. Co. v. Liepelt</u>, 444 U.S. 490, 493 (1980)).

In doing so we recognize that even if the jury had been given a set of current tax rates, their application to future earnings would embody some degree of speculation since of course tax rates do change, as do circumstances -- such as marital status -- that might affect the rates that the plaintiff would have to pay in the future. In any event, application of current federal and New York State rates to the plaintiff's estimated annual income reflects approximately $14,500.00 in federal taxes and about $4,500.00 in New York State taxes, or a rate of slightly more than 25 percent. <u>See</u> http://www.irs.gov/irb/2014-47_IRB/ar14.html (Bulletin No. 2014-47 (Nov. 17, 2014); www.tax.ny.gov/pdf/current_forms/it/it2105i.pdf (Instructions for Form IT-2105)

---

[48] Since defendant does not challenge the jury verdict awarding past lost income, we do not pursue the issue with regard to that award, and instead focus solely on the amount awardable for projected future lost income.

(2015). An adjustment of 25 percent yields a reduced future economic-damage award of $1.5 million, which we will include in a proposed remittitur.


B. Future Pain, Suffering & Emotional Distress


Defendant also challenges the jury's award of $900,000.00 for pain and suffering, specifically in the form of emotional distress.[49] (Deft's Mem. 15-16; Deft's Reply Mem. 4-6). Citing various federal and state-court decisions that reduced pain-and-suffering awards, the LIRR argues that a new trial would be appropriate unless plaintiff accepts a reduced award of not more than $200,000.00. (Deft's Mem. 16). In opposition, plaintiff cites a number of cases resulting in far more generous awards or settlements for arguably similar injuries, although none involved motions to reduce a trial award. (Pltff's Mem. 6-8).


The court's review of a jury's compensatory damage award for excessiveness is "narrow", and it may set aside such an award "only whe[n] the award is so high as to shock the judicial conscience and

---

[49] The award for future non-economic damages was limited to emotional distress because there was no dispute that plaintiff was not suffering any pain from his injury. (See Tr. 433).

67

constitute a denial of justice." Turley, 774 F.3d at 162 (quoting DiSorbo v. Hoy, 343 F.3d 172, 183 (2d Cir. 2003)). Accord, e.g., Nairn, 837 F.2d at 566-67 (quoting Batchkowsky v. Penn Central Co., 525 F.2d 1121, 1125 (2d Cir. 1975)); Dilger v. Consol. Rail Corp., 133 F.3d 906, 1997 WL 829251, *1 (2d Cir. Oct. 31, 1997). This standard is more deferential to the jury's findings than is the state-law criterion embodied in C.P.L.R. § 5501(c), which requires the court to look to whether the award "deviates materially from what would be reasonable compensation." See, e.g., Stampf, 761 F.3d at 207 (discussing Wallace v. Suffolk Cty. Police Dep't, 2010 WL 3835882 (E.D.N.Y. Sept. 24, 2010)). See also Dershowitz v. United States, 2015 WL 1573321, *37 (S.D.N.Y. April 8, 2015); Bakalor v. J.B. Hunt Transp., Inc., 2013 WL 3185546, *3 (S.D.N.Y. June 24, 2013); Okraynets, 555 F. Supp. 2d at 434-35. Nonetheless, as is the case under section 5501(c), courts applying the federal standard "have found it useful to review awards in other cases involving similar injuries," but in doing so the court must "bear[] in mind that any given judgment depends on a unique set of facts and circumstances." Nairn, 837 F.2d at 568 (citing cases). As recently explained by the Second Circuit, while recognizing that "[a]wards for mental and emotional distress are inherently speculative[,] . . . a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate."

Turley, 774 F.3d at 162 (quoting Payne v. Jones, 711 F.3d 85, 93 (2d Cir. 2012)).

As we understand the evidentiary premises for the award of future non-economic damages to Mr. Leo, they involve three principal circumstances. First, plaintiff must live permanently with a somewhat weakened dominant hand. This in itself will be the source of some emotional discomfort, although it does not involve physical pain. In addition, plaintiff's hand weakness imposes some modest limits on his engaging in certain recreational activities and in his interaction with others. Second, this condition was found by the jury to have deprived plaintiff of his career as an employee of the railroad and of his prospects for future meaningful alternative employment, with attendant financial worries. Third, and perhaps more importantly, his injury has led to a loss of independence from his parents and deprivation of the satisfaction that comes from a fulfilling job.

In this case the plaintiff seeks to justify the jury's award for these injuries by citing five cases in which awards or settlements were made, in part, for future pain and suffering, with the totals ranging from $450,000.00 to $1.4 million. (Pltff's Mem. 7). None is persuasive as a comparator to plaintiff's

circumstances, which involve no future pain and no notable outward signs of major emotional distress or dysfunction.

In Cruz v. Bay Plaza Cmty. Ctr., 2007 WL 4863936 (Sup. Ct. Bx. Cty. Nov. 6, 2007), the parties settled for a total of $850,000.00. The fact that this was a settlement diminishes to the vanishing point its relevance here, since it provides no guidance as to what a jury would have done had the matter been presented to it, much less what a court would have done if the jury had rendered a verdict for the agreed-upon sum. Still more pointed is the fact that the cited report does not offer any breakdown as to how much of the total was attributed to future pain and suffering as distinguished from past pain and suffering.[50] Further, the injuries and resulting treatment, as described in the report, appear particularly serious in terms of producing physical pain in addition to mental distress. The plaintiff was apparently stabbed, suffered "extensive bleeding", and lacerations of both his medial and ulnar nerves, and underwent what are described as multiple unsuccessful "exploratory surgeries" in attempts to correct his contracture of the hand and nerve damage. Id.

---

[50] It appears that plaintiff did not seek recovery for economic injuries. Cruz, 2007 WL 4863936.

Plaintiff's citation of <u>McGuire v. New York State Urban Dev. Corp.</u>, 2008 WL 5119873 (Sup. Ct. Queens Cnty. Sept. 15, 2008), is also unhelpful. It too involved a settlement, which, as noted, offers little or no guidance as to the extent of a jury's discretion in awarding damages for future emotional distress. As for the settlement amount -- which totaled $1.4 million -- the cited report offers no breakdown of the amount attributable to future pain and suffering as distinguished from past pain and suffering and from economic losses, for which the plaintiff was also seeking recovery. <u>Id.</u> In any event, the injuries suffered by the plaintiff, occasioned by a construction-site accident, involved a partial amputation of two fingers, followed by four additional surgeries "for amputation revisions". <u>Id.</u> These circumstances appear far more painful and traumatic than Leo's, thus substantially inflating McGuire's settlement recovery above what plaintiff here could legitimately expect.

The remaining three cases cited by plaintiff at least involve state-court jury awards, although in two there is no indication that the courts were called upon to address challenges to their size.[51] <u>See</u> <u>Ford v. Cnty. of Suffolk</u>, 2009 WL 6325746 (Sup. Ct.

---

[51] Defendant appears to suggest that jury awards that are not subjected to an excessiveness challenge are meaningless for

Suffolk Cty. Oct. 5, 2009); <u>Mucciarone v. Tammaro</u>, 2007 WL 1830219 (Sup. Ct. Nassau Cnty. May 21, 2007); <u>Keefe v. E&D Specialty Stands, Inc.</u>, 16 NY. J.V.R.A. 7:C3 (Sup. Ct. Erie Cnty. May 24, 1999), <u>aff'd</u>, 272 A.D.2d 949, 708 N.Y.S.2d 214 (4th Dep't 2000). Nonetheless, they offer no meaningful support for plaintiff's defense of the challenged jury verdict.

In <u>Ford</u>, the jury awarded $450,000.00 for pain and suffering, but the cited report does not break down the amount from this total that is attributable to future, as compared to past, pain and suffering. Moreover, the injuries, as described, seemingly involved a great deal more physical pain than appears to have been suffered by Leo, as well as more extensive permanent physical deficits. The plaintiff suffered a fractured clavicle as well as neck pain -- the fracture healed badly, causing injury to plaintiff's brachial plexus (the presumed link that triggered counsel's citation of this case) -- plus continuing pain and a 50-percent decrease in the

---

present analytical purposes. (Deft's Reply Mem. 4-5). We disagree, since a pattern of unchallenged jury awards would offer a general framework for assessing whether the current verdict is so outside the norm as to justify a remittitur. Indeed, consistent with that point, defendant cites several decisions that upheld jury awards as not excessive. (<u>E.g.</u>, Deft's Mem. 13 (citing <u>D'Amato v. Long Island R.R. Co.</u>, 874 F. Supp. 57 (E.D.N.Y. 1995); <u>Clark v. Burlington N., Inc.</u>, 726 F.2d 448 (8th Cir. 1984)).

range of motion of the plaintiff's arm as well as decreased arm and hand strength. 2009 WL 6325746.

The next cited case, <u>Mucciaroni</u>, involved a total award of $1.04 million to a couple for injuries sustained by the wife in an automobile accident. The cited report does not explain the allocation between past and future pain and suffering, and the facts cited make clear that the total was inflated by circumstances not present in Leo's case. The wife was trapped in the car for some time and had to be cut out from it. She sustained serious back injuries, with a herniated disk impinging on the spinal cord and causing continuing pain, permanent neck immobility, headaches and carpal-tunnel syndrome in her dominant wrist, along with numbness and a weakened grip, together with a likelihood of future surgery and the frightening potential for sudden paralysis. 2007 WL 1830219. These factors put this case in an entirely different category from plaintiff's.[52]

The last case that plaintiff cites, <u>Keefe</u>, involved a jury award of more than $2.7 million under the New York Labor Law, of

---

[52] In addition, we note that the husband had asserted a claim for loss of consortium, <u>Mucciaroni</u>, 2007 WL 1830219, and the cited report offers no insight as to what portion of the award was attributable to that claim.

which $1 million was attributable to future pain and suffering. The plaintiff's injuries were far more serious and productive of permanent pain and other continuing major physical discomfort than was Leo's. Keefe fell through an opening in a work platform, causing the transection of the ulnar nerve, as his arm was skewered by a "protruding steel member". 16 NY. J.V.R.A. 7:C3. As a result, he underwent a failed surgery to repair the damage, and then two tendon transplant procedures. Id. Moreover, although those transplants alleviated the initial clawing of the hand, the plaintiff was suffering from permanent numbness in the outer part of his hand and permanent significant pain in the arm and hand as well as permanent atrophy and weakness in the arm. Plaintiff also presented a more substantial case than Leo that these conditions meaningfully interfered with his ability to interact with others, notably his young children. Id.

Defendant also makes an effort to unearth sufficiently comparable cases, in which the court passed upon a challenge to the verdict for pain and suffering. (See Deft's Mem. 13-15). Although none is directly comparable -- most involving conditions likely to cause permanent pain and in some cases significant disfigurement[53]

---

[53] See Deft's Mem. 12-13 (citing Robinson v. New York City Dep't of Educ., 94 A.D.3d 428, 941 N.Y.S.2d 123 (1st Dep't 2012);

74

-- and a few are many decades old[54], they do underscore the fact that some state and federal courts have been fairly restrictive in their assessment of such awards.[55] What they do not show is a pattern of awards for pure non-economic injury that involves predominantly or exclusively emotional distress.

That said, we have examined other court decisions for an insight as to governing standards, and they suggest that the $900,000.00 award is excessive. We start with a case that defendant cites (see Deft's Mem. 12-13) -- Carney v. Inter-Continental Hotels Corp., 1998 WL 474209 (S.D.N.Y. Aug. 13, 1998) -- in which the court reduced a future-economic-loss award, but also addressed the jury's award of pain and suffering (past and future) for a worker

---

Biejanov v. Guttman, 34 A.D.3d 710, 826 N.Y.S.2d 111 (2d Dep't 2006)).

[54] See Deft's Mem. 13 (citing Prata v. Nat'l R.R. Passenger Corp., 70 A.D.2d 114, 420 N.Y.S.2d 276 (1st Dep't 1979); Crandall v. St. Mary's Hosp. of Troy, 13 A.D.2d 595, 212 N.Y.S.2d 189 (3d Dep't 1961); Mracheck v. Sunshine Biscuit, 283 A.D. 105, 126 N.Y.S.2d 383 (1st Dep't 1953)). Defendant does calculate the amount of the awards in Crandall and Mracheck in current dollars (see Deft's Mem. 13 n.2), although the large time gap leaves room for changing standards as to how much money is reasonable as compensation for such injuries.

[55] We note that reliance on state-court decisions imposing remittitur may tend to overstate the stringency of judicial review for our purposes because, as noted, the New York standard for remittitur is less deferential to jury verdicts than is the federal criterion, which applies in this case. See pp. 67-68.

who had lost a portion of his right index finger, below the second joint, and was awarded $200,000.00 for "past injury, pain, and suffering" and $400,000.00 for "future injury, pain, and suffering." Id. at *1. The court upheld both awards under New York's section 5501(c) test, and in doing so it cited for support a number of New York cases, one of which is at least modestly instructive here. Id. at *1-2.

In Taylor v City of New York, 150 Misc.2d 528, 530, 576 N.Y.S.2d 974, 976 (Sup. Ct. App. Term 1991), a so-called slip-and-fall case, the court addressed, among other issues, the justification for an award of $800,000.00 for "serious injury to [plaintiff's] hand." As described by the court, plaintiff was a 25-year-old mother of two. Taylor, 150 Misc.2d at 531, 576 N.Y.S.2d at 977. As a result of the accident, she lost the use of the three middle fingers of her dominant hand. Id. This resulted from the severing of two tendons and damage to a third, with consequent nerve damage. Id. In consequence, the middle finger was bent towards the palm, the other two fingers showed a less evident bending, and plaintiff had lost 80 percent of her strength in carrying objects with that hand and in performing fine manipulations, including typing. Taylor, 150 Misc.2d at 531-32, 576 N.Y.S.2d at 977. She was left with some pain in a residual scar,

and a tingling sensation in the affected fingers. Id. The appellate panel upheld the jury award "in view of the young age of the plaintiff and the seriousness of the injuries." Id.

This reported decision does not indicate the breakdown between past and future non-economic damages.[56] Moreover, as the opinion makes clear, the plaintiff was suffering permanent pain and physical discomfort from the tingling sensation. Furthermore, there is no indication as to how the court might have valued damages based mainly or exclusively on emotional distress -- the relevant concern here -- although we may infer that such distress was one element of the circumstances that led to the award.

To similar effect is another decision cited in Carney, namely, Mirand v. City of New York, 190 A.D.2d 282, 598 N.Y.S.2d 464 (1st Dep't 1993). In that case one of the two plaintiffs was stabbed in the wrist, leading to immediate hospitalization and surgery, with a hospital stay of seven days, and subsequent physical therapy. Mirand, 190 A.D.2d at 285, 598 N.Y.S.2d at 467. The victim was left at that point with a somewhat crooked wrist and two hanging

---

[56] The accident occurred in 1985, six years before the appellate decision, Taylor, 150 Misc.2d at 531-32, 576 N.Y.S.2d at 977, thus suggesting that a significant portion of the award was for past pain and suffering.

fingers, with some numbness. Id. Plastic surgery followed, leaving one finger somewhat hanging, some scarring, limitation in the plaintiff's ability to grasp with the hand and occasional pain if the hand was bumped or the weather was cold. Mirand, 190 A.D.2d at 285-86, 598 N.Y.S.2d at 467. In addition she was no longer able to type. Mirand, 190 A.D.2d at 286, 598 N.Y.S.2d at 467. On this record, the appellate court upheld an award of $750,000.00, apparently for non-economic injuries, both past and future. Mirand, 190 A.D.2d at 285-86, 291, 598 N.Y.S.2d at 467, 470-71. Again, a substantial portion of the award is undoubtedly attributable to past pain and suffering -- the appellate decision was issued eleven years after the incident -- and much of it is undoubtedly addressed to plaintiff's pain rather than simply emotional distress.

The two more recent cases cited by defendant also involve principally damage to hands and arms, with reduced awards ranging from $175,000.00 to $350,000.00. (Deft's Mem. at 12 (citing Robinson v. New York City Dep't of Educ., 94 A.D.3d 428, 941 N.Y.S.2d 123 (1st Dep't 2012); Biejanov v. Guttman, 34 A.D.3d 710, 826 N.Y.S.2d 111 (2d Dep't 2006)). These cases are also modestly helpful in seeking a range in which a jury may operate for such injuries, although they have limited probative weight since (a) they concern predominantly physical problems rather than emotional

78

distress, (b) they do not address the circumstance of an adult who has lost the ability to perform vocationally in his field of experience and faces the prospect of long-term joblessness and (c) they are state-court cases applying section 5501(c), which, as noted, is less respectful of jury decisions than the federal standard, which we must apply here.

For further guidance we look to federal cases assessing claims for emotional distress. Many of these cases involve the impact of misconduct by employers or fellow employees, and the amounts that the courts have permitted for emotional or psychological injury vary significantly depending on whether the plaintiff suffered meaningful psychological damage, as distinguished from the normal depressive fallout from one or a series of distressing events at the workplace. Compare, e.g., Turley, 774 F.3d at 162-63 (upholding award in excess of $1 million for past and future emotional distress based on proof of "years of grotesque psychological abuse leading to a marked decline in Turley's mental health and well-being", including hospitalization and diagnosis of "post-traumatic stress disorder, depression and panic disorder") (citing Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655 (2d Cir. 2012)), with Stampf, 761 F.3d at 208, 210 (reducing remittited award for past mental and emotional distress to $100,00.00 and award of future

emotional distress to $20,000.00, based on false arrest on the job;
reduction ordered despite evidence of public humiliation,
continuing distress at working in the same place as fellow
employees who witnessed the arrest, and resultant alcohol abuse and
inter-personal relationship difficulties).

A similar approach seems to be common in cases involving the
loss of stable employment, a circumstance present here. Thus, in
Ramirez v. Off-Track Betting Corp., 1996 WL 210001 (S.D.N.Y. April
30, 1996), aff'd in relevant part, 112 F.3d 38 (2d Cir. 1997), a
case involving a plaintiff who lost his OTB job in unfair
administrative proceedings, the court granted a remittitur of the
award for emotional distress (past and future) from $1,145,625.00
to $500,000.00 but declined to reduce it further, citing evidence
of "extreme psychological harm". Id. at *6-7 (citing cases). In so
doing, the court made plain that, absent such evidence of serious
psychiatric issues related to plaintiff's loss of his job, it would
have awarded considerably less. Id. at *7 ("An award of this amount
would not be appropriate for emotional damages . . . except in the
most unusual circumstance."). Thus, in justifying the reduced
award, it noted that plaintiff "was incapacitated completely for a
time and will continuously be threatened with instability in the
future." Id. As the court observed: "Ramirez's job at the OTB

80

tethered him to a stable existence: the job provided him not only with the ability to obtain the monetary means and health benefits necessary to seek treatment, but also, on a more abstract level, it gave him the link with mainstream society that kept him a stable and productive person." Id. The Court of Appeals then affirmed this aspect of the judgment. See Ramirez, 112 F.3d at 41.

This result was explicitly premised on the fact that the plaintiff was an already psychologically damaged individual, whose pre-existing fragility resulted in his going into an irremediable tailspin when he lost his job. See Ramirez, 1996 WL 210001 at *6 n.3 (describing testimony of plaintiff's psychiatrist to the effect that after job loss "plaintiff was 'unable to function' and 'never got better"). Absent such serious injury, awards for emotional distress are likely to be more in the range found in Stampf. See generally MacMillan v. Millenium Broadway Hotel, 873 F. Supp. 2d 546, 559-63 (S.D.N.Y. 2012) (citing cases); Thorsen v. Cnty. of Nassau, 722 F. Supp. 2d 277, 291-95 (E.D.N.Y. 2010) (citing cases); Bick v. City of New York, 1998 WL 190283, *25-27 (S.D.N.Y. April 21, 1998) (citing cases).

In our case plaintiff proffered no evidence of any current emotional dysfunction. Rather, he testified to what could fairly be

81

said to be some sadness and frustration at his plight -- an understandable reaction (see, e.g., Tr. 171-72), and one likely to be prolonged in the absence of a significant change in circumstances. He lost his job and his ability to perform in other work that is within the range of his training, experience and now limited physical abilities, and, according to the jury, he may well not find comparable work again. This prolonged period of likely enforced limitations on his professional life surely justified more than so-called garden-variety damages.[57] Nonetheless, it equally does not justify an award of close to $1 million, as reflected in the jury verdict. Moreover, this is particularly true since, for reasons already discussed, plaintiff will be entitled to a very substantial award for anticipated lost income, thus relieving at least some of the strands of circumstances that would contribute to future emotional distress -- notably, his loss of independence from

---

[57] "Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: garden-variety, significant and egregious." Olsen v. Cnty. of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (internal quotations omitted). Accord Stampf, 761 F.3d at 206-07; MacMillan, 873 F. Supp. 2d at 560. Garden variety claims "generally merit $30,000 to $125,000 awards," MacMillan, 873 F. Supp. 2d at 561 (citing cases including, inter alia, Lore v. City of Syracuse, 670 F.3d 127, 177 (2d Cir. 2012)), while "courts in this Circuit . . . have routinely found that awards ranging from $100,000 to $500,000 are not excessive for significant emotional distress damages." Thorsen, 722 F. Supp. 2d at 293. "Egregious" injuries presumably may justify substantially greater sums. See, e.g., Turley, 774 F.3d at 163; Olson, 615, F. Supp. 2d at 47.

his parents and anxiety about his financial status generally.

Under these circumstances, we conclude that the limit of a defensible award for future non-economic damages is, as defendant suggests, a total of $200,000.00. This figure reflects, in part, the fact that plaintiff did not exhibit obvious emotional distress. Nonetheless, given his testimony and the length of time over which his physical disability and its impact on his life may affect him, we find that he has made a case for which a jury could have reasonably discerned something more than garden-variety non-economic injury -- which defendant itself seems to acknowledge by proposing the $200,000 figure in its motion. (See Deft's Mem. 16).

In arriving at this figure, we emphasize, as the Second Circuit has noted, that "[a]wards for mental and emotional distress are inherently speculative. There is no objective way to assign any particular dollar value to distress." Turley, 774 F.3d at 162. Attempting to discern a clear pattern from other cases in which the key circumstances driving a decision by a jury or judge -- whether obvious or subtle -- are likely to differ in a host of ways, only adds to the impressionistic nature of the Rule 59 process in this regard. Moreover, we note that some individuals, because of personality, may appear more outwardly emotionally stable, even as

they suffer internally and perhaps stoically, a circumstance that may tend to limit their recoverable damages. To some extent that may be a factor in this case, in which plaintiff never evinced a great deal of observable distress, although his objective circumstances in all likelihood generated more emotion (even if suppressed) than was indicated by outward appearances. All of that said, our best judgment is that the pattern of decisions on emotional distress awards in a variety of settings dictates the limitations on recovery that we have described for this category of damages.

## CONCLUSION

For the reasons stated, defendant's motion for a new trial is granted in part and denied in part. We direct that a new trial on damages be conducted unless plaintiff agrees to entry of a judgment for (1) $189,122.64 in past economic damages, (2) $1.5 million in future economic damages, (3) $100,000.00 in past non-economic damages, and (4) $200,000.00 in future non-economic damages. If plaintiff chooses to accept the foregoing terms for a judgement, he is to submit a form of judgment within two weeks. If he chooses not to do so, he is to advise the court accordingly within two weeks.

Dated: New York, New York
      April 30, 2015


_____
**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**



**Copies of the foregoing Memorandum and Order have been sent to:**

**Marc Twyman Wietzke, Esq.**
Flynn & Wietzke, P.C.
1205 Franklin Avenue
Garden City, NY 11530

**William G. Ballaine, Esq.**
Landman Corsi Ballaine & Ford PC
120 Broadway, 27th Floor
New York, NY 10271

**William J. Blumenschein, Esq.**
Long Island Railroad Company
Law Department - 1143
93-02 Sutphin Blvd. Jamaica Station
Jamaica, NY 11435